UNITED STATES v. HAMBURGH-AMERICAN S. S. LINE et al.

(District Court, S. D. New York.    October 13, 1914.)

MONOPOLIES (§ 16*)—COMBINATION BETWEEN STEAMSHIP COMPANIES—VIOLATION OF ANTI-TRUST ACT.

The employment by a combination of steamship companies engaged in the trans-Atlantic passenger business of so-called "fighting ships," or extra vessels, which, when a vessel not owned by a member of the combination, made lower rates than one which did, was placed at a berth near such vessel, and met or went below such rates, *held* to constitute an undue and unreasonable restraint of foreign trade and commerce, and an attempt to monopolize such commerce, in violation of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200) ; but the exaction by the members of the combination of agreements by their agents to sell passage tickets for such members only, or the division of the business between the members in a predetermined proportion, *held* not a violation of the act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

In Equity.    Suit by the United States against the Hamburgh-American Steamship Line and others.    Bill dismissed as to two defendants, and decree for complainant for part of the relief prayed for against the other defendants.

This is a proceeding in equity under the Anti-Trust Act to terminate and dissolve a combination of various trans-Atlantic steamships engaged in the transportation of passengers.    The transactions complained of are concerned mainly with the transport of steerage passengers.

H. Snowden Marshall, U. S. Atty., and Henry A. Guiler, Asst. U. S. Atty.

Spooner & Cotton, of New York City (John C. Spooner, of New York City, of counsel), for Hamburgh-American Line, Allan Line, and Canadian Pac. Ry. Co.

Choate & Larocque, of New York City (Joseph Larocque and Nelson Shipman, both of New York City, of counsel), for North-German Lloyd and defendants Schwab and others.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham, Norman B. Beecher, Charles Burlingham and Roscoe H. Hupper, all of New York City, of counsel), for American Line, Anchor Line, Dominion Line, Holland-America Line, Red Star Line, White Star Line, and defendants Franklin, Coverly, and Gips.

Lord, Day & Lord, of New York City (Lucius H. Beers and Allan B. A. Bradley, of New York City, of counsel), for Cunard S. S. Co., Limited, and defendant Sumner.

Ralph J. M. Bullowa, of New York City, for Russian-American Line and defendants Johnson and Strauss.

Before LACOMBE, COXE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge.    The writer's opinion as to what, under prior decisions, was the construction to be given to the Sherman

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Anti-Trust Act, will be found fully set forth in U. S. v. American Tobacco Co. (C. C.) 164 Fed. 700. If that construction were followed in this case, there could be no doubt as to the conclusion to be reached upon the facts proved. It is practically not disputed that, by the various agreements and conferences which together constitute the combination complained of, that branch of trans-Atlantic commerce which is concerned with the transport of steerage passengers is arbitrarily interfered with, so that the proportions of it carried by the various lines, which have so combined, are not as they would be if full, free, and unrestricted competition were the sole controlling power to effect the distribution.

Since the decision above cited, however, there have been two exhaustive opinions of the Supreme Court dealing with this act. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663. The effect of these would seem to be that contracts and methods of business, which do in fact restrain or interfere with competition, are not to be held obnoxious to the provisions of the act, unless such restraint or interference is "unreasonable" or "undue."

"Without going into detail, and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs, which it was thought would flow from the undue limitation or competitive conditions caused by contracts or other acts of individuals or corporations, led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act, or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but, on the contrary, were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy. * * * The statute * * * evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference that is an undue restraint." Standard Oil Co. v. United States, 221 U. S. 58, 59, 60, 31 Sup. Ct. 515, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734.

"Applying the rule of reason to the construction of the statute, it was held in the Standard Oil Case that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-Trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance. It was therefore pointed out that the statute did not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose." United States v. American Tobacco Co., 221 U. S. 179, 31 Sup. Ct. 648, 55 L. Ed. 663.

To determine whether any particular course of conduct is or is not "undue" or "unreasonable" involves, of course, a consideration of all the surrounding circumstances, which may be multifarious. Moreover, opinions will sometimes differ as to what should be the answer to such a question. Upon a given statement of facts 12 unprejudiced jurymen will sometimes unanimously reach the conclusion that the conduct of an individual evidenced "due" and "reasonable" care and prudence, when upon the same state of facts 12 other unprejudiced jurymen will unanimously reach a different conclusion. Courts have recognized this uncertainty, for it has been frequently held in actions for negligence that although a judge may direct an appropriate verdict, when all intelligent minds would agree as to the inference to be drawn from proved facts, he should send the cause to the jury whenever there might be an honest difference of opinion as to whether the conduct of an individual exhibited "due" and "reasonable" care and prudence. So, too, when a question arises in an equity court as to the "reasonableness" of certain transactions different chancellors may differ in their answers. Thus in United States v. Periodical Clearing House, a litigation arising under the Sherman Act and involving certain regulations made by what was known as the "Magazine" or "Periodical Trust," this court was evenly divided in opinion as to whether such regulations were reasonable or not.[1]

Referring now to the facts in proof: One of the matters complained of is what is called in the testimony the providing of "fighting ships." Upon occasions when some steamship owner or charterer, not a member of the combination, has put a vessel on a berth adjoining one from which vessels of a member of the combination were about to sail, and has offered to carry passengers at a lower rate than that asked by such member, an extra vessel has been put on, ostensibly by one of the lines in the combination, but really by the combination itself, at the same or a lower rate, and all have co-operated to furnish such a "fighting ship" and thereby keep out the competitor. This seems clearly to be within the prohibition of the act; the case is analogous to that presented in United States v. Eastern States Retail Lumber Dealers' Association. In that case some wholesale lumber dealers, learning the names and addresses of the customers of retail dealers who bought from them, had taken away such customers by offering to sell them direct at wholesale prices. An individual retail dealer, who had thus lost customers, was of course free to give information of his experience to any of his business associates; but an association of retail dealers which gathered such information and circularized the retail trade with a list of the names of the wholesalers who had done so was held to be a combination to boycott or blacklist, and a decree was entered in this court enjoining the further preparation and issuance of such circulars, which decree was affirmed on appeal. 201 Fed. 581; 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490.

[1] Decided March 22, 1913, by dismissal of complaint, for the reason that the government had failed to satisfy a majority of the court that it was entitled to the relief prayed for; not reported, as no opinions were filed.

The testimony (which is voluminous) fails to satisfy us that the defendants, or any of them, have charged excessive or exorbitant rates for the transportation of passengers of any class, especially when it is considered that vastly more in the way of safety, speed, sanitary conditions, physical comfort, etc., is now given to the passenger than was given to him before these agreements and conferences were entered into.

Much is made in argument of the circumstance that members of the combination employ only agents who will agree to confine their business to selling passage tickets for such members. When the deplorable conditions which existed before this method of business was adopted are considered, it would seem that such an arrangement has greatly benefited the traveling public, especially the more ignorant class of many different nationalities which travels in the third class or steerage. Moreover, dealing as it does merely with the control of defendants' agents, who are free to accept or decline such agency, it is analogous to the case which was presented in United States v. Periodical Clearing House, supra, where, upon the question whether or not such control of agents was or was not within the act, this court was divided in opinion and dismissed the bill. No attempt was made to review that decision on appeal. It is thought, therefore, that complainant has not shown itself entitled to relief on this branch of the case.

The main subject-matter of the controversy, viz., the controlling of transportation so as to allot proportionate shares of it to the different defendants who are in the combination, has recently been most exhaustively considered by the standing committee on merchant marine and fisheries under resolutions of the House of Representatives in Congress. It is manifest from its report that the committee had before it substantially the same evidence which is contained in the record in this case. There is nothing to add to the elaborate presentation of all sides of the controversy which will be found in that report, and we find it most persuasive to the conclusion that, in view of the peculiarities of ocean transportation, the method adopted by the defendants— if purged of its obnoxious feature, the "fighting" ship—is a reasonable one, which, so far from restraining trade, really fosters and protects it, by giving it a stability which insures more satisfactory public service for all concerned. Without this method, or something like it, there would be, in the language of the committee, one or other of two results:

"The lines would either engage in rate wars which would mean the elimination of the weak and the survival of the strong, or to avoid a costly struggle they would consolidate through common ownership. Either would mean monopoly fully as effective, and it is believed more so, than can exist by virtue of [this] agreement."

It seems, therefore, that this particular combination comes fairly within the exception to a strictly literal construction of the statute, which is indicated in the Standard Oil and Tobacco Cases.

The Allan Line and Canadian Pacific Line withdrew from the fighting ship agreement before the bill was filed. As to both these defend-

ants the bill is dismissed. As to the other defendants injunction will issue against the continuance of the "fighting ships," and as to the other prayers for relief the bill is dismissed. Since the government has not prevailed on the main part of the case, the decree will be without costs.