UNITED STATES v. PRINCE LINE, Limited, et al.

SAME v. AMERICAN–ASIATIC S. S. CO. et al.

(District Court, S. D. New York. February 3, 1915.)

1. MONOPOLIES ⊚⟷16—RESTRAINT OF TRADE—AGREEMENT BETWEEN SHIP-OWNERS—REASONABLENESS.

An agreement between all the shipowners engaged in the same trade as to the number of vessels each should operate, the dates of sailings, exchange of freight between lines, and rates of freight, made for the purpose of assuring shippers regular sailings and affording them a fair rate so that they might meet the competition of trade from other countries, is not in itself an unreasonable restraint of trade contrary to the Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ⊚⟷16.]

2. MONOPOLIES ⊚⟷16—STATUTES—CONSTRUCTION.

The construction that the Sherman Anti-Trust Act prohibits only unreasonable restraint of trade is the same when applied to acts of common carriers as when applied to others.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ⊚⟷16.]

3. SHIPPING ⊚⟷147—FREIGHT RATES—REASONABLENESS—OCEAN CARRIERS.

Regular rates for the ocean carrier trade are not unreasonable because at particular times or places tramp steamers are willing to. cut them greatly in order to secure a cargo.

[Ed. Note.—For other cases, see Shipping, Cent.Dig. §§ 500, 506, 507; Dec.Dig. ⊚⟷147.]

4. MONOPOLIES ⊚⟷16—RESTRAINT OF TRADE—REBATE—EXCLUSIVE CONTRACTS.

The practice of a combination of ocean carriers to give rebates to all shippers who ship exclusively by their lines, which tended to secure more regular cargoes and to enable the carriers to anticipate the needs of the trade, is not an unlawful restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ⊚⟷16.]

5. MONOPOLIES ⊚⟷24—INJUNCTION—REFUSAL OF ACCOMMODATIONS.

Where there was evidence, in proceedings by the United States to dissolve a combination of ocean carriers under the Sherman Anti-Trust Act, that one of the members of the combination had refused to carry a cargo for a certain shipper when there was unengaged space on its vessels, an injunction will be issued against the combination and its members to prohibit such practice in the future.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⊚⟷24.]

⊚⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. MONOPOLIES ⬤⟹24—RESTRAINT OF TRADE—REASONABLENESS.

A violation of the Sherman Anti-Trust Act is not established unless there is some proof of actual unreasonable interference with the natural course of trade, and, where neither carrier nor shipper complain, it may be inferred that there is no unreasonable restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⬤⟹24.]

7. MONOPOLIES ⬤⟹24—INJUNCTION—FIGHTING SHIPS.

Where a conference agreement between ocean carriers contained a provision for "fighting ships," but there was no evidence that one had ever been used, no injunction will be granted against that practice.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⬤⟹24.]

Separate suits under the Sherman Anti-Trust Act by the United States of America against the Prince Line, Limited, and others, and against the American-Asiatic Steamship Company and others, to dissolve certain alleged unlawful combinations and to enjoin certain practices of the respective companies. Bill against the Prince Line, Limited, and others dismissed, except as to the injunction against a certain practice; and that against the American-Asiatic Steamship Company and others dismissed.

The records are separate, but both causes were heard on the same day and may conveniently be discussed in a single opinion. In each cause the petition alleges that for some years defendants have been engaged in an unlawful conspiracy to restrain trade and destroy competition in ocean carriage between ports in the United States and specified foreign ports, and to monopolize such trade. The relief prayed is that each of these alleged unlawful combinations be declared illegal, and that certain of their practices in conducting the business of their respective combinations be enjoined.

In United States v. Prince Line, Limited, et al.:

Ernest E. Baldwin and Stanley D. Montgomery, Sp. Asst. Attys. Gen., and H. Snowden Marshall, U. S. Atty., of New York City, for the United States.

Convers & Kirlin, of New York City (J. Parker Kirlin and Mark W. Maclay, Jr., both of New York City, of counsel), for defendants Prince Line, Limited, and others.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham, Charles Burlingham, and Roscoe H. Hupper, all of New York City, of counsel), for defendants Lamport & Holt, Limited, and others.

Spooner & Cotton, of New York City (John C. Spooner, of New York City, of counsel), for defendants Hamburg-American Line and others.

In United States v. American-Asiatic S. S. Co. et al.:

Ernest E. Baldwin and Stanley D. Montgomery, Sp. Asst. Attys. Gen., and H. Snowden Marshall, U. S. Atty., of New York City, for the United States.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham, Charles Burlingham, and Roscoe H. Hupper, all of New York City, of counsel), for defendants American-Asiatic S. S. Co. and others.

John C. Spooner, of New York City, for defendant Hamburg-American Line.

Convers & Kirlin, of New York City (J. Parker Kirlin and Mark W. Maclay, Jr., both of New York City, of counsel), for defendants Dodwell & Co., Limited, and others.

Before LACOMBE, COXE, WARD, and ROGERS, Circuit Judges.

## Petition Against Prince Line and Others.

LACOMBE, Circuit Judge. The combination against which this proceeding is directed, composed of two British and two German steamship companies, has been practically dissolved as a result of the European War. In consequence the questions here presented have become largely academic, and it seems unnecessary to undertake any ex-

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

haustive discussion of the facts. A brief statement of the propositions contended for and of our disposition of them will be sufficient.

[1] The combination, while it existed, was the well-known sort not infrequently found among ocean carriers, where two or more shipowners agree together as to the number of vessels they will operate in a particular trade, as to number of voyages to be made between specified ports, as to dates of sailings, as to exchange of freight to be carried when the vessel of one or another line has her space engaged or it is more convenient to use one vessel instead of another, as to rates of freight, etc. The fundamental question is whether what has been done by the parties to the combination has operated an unreasonable restraint of trade, or has resulted in a monopolization of trade between the ports specified within the terms of the Sherman Anti-Trust Act.

[2] Preliminary to that question, however, there is submitted a proposition advanced by the government to the effect that the later decisions of the Supreme Court, in cases like the Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, have no application in this litigation because the defendants are common carriers. We find no authority in the reports, nothing in the text of the act, nor in the congressional proceedings which accompanied its passage, to support the proposition that the act is to have one construction when defendants are manufacturers, merchants, or traders, and another and different one when they are common carriers. The acts of these defendants are to be considered in the light of the construction which has been given to the act by the Supreme Court irrespective of their particular vocation.

The commerce affected is that between New York and New Orleans and certain ports in Brazil; coffee mainly this way, products of the United States out. These exports from the United States are in competition with similar exports from Europe to Brazil, an older trade and a larger one. At the time it was formed the parties were in the trade and handled all the trade there was. No one was frozen out by their combination and there was no greater monopoly than existed before. Indeed, there is less of a monopoly now than there was then, since a new independent carrier, the Lloyd Braziliano, has come in as a competitor. Some of these defendants operated, or were in combination with, some of the foreign lines which handled the competing commerce from Europe to Brazil. Their story of the genesis of their combination, here complained of, is this: The object was to give regular and sufficient service at stated intervals, so that there would not be an overplus of vessels one month and a scant supply the next month; to have regular sailing dates known far in advance so that shippers could make firm contracts for future deliveries; to give merchants an opportunity of changing their engagements from one line to another as convenience required; to develop outports and to give an opportunity to low classes of cargo to get regular transportation; to establish uniform rates of freight, uniform so far as the several

lines were concerned, although naturally liable to change from time to time; and to establish rates so as to meet the European rates, fixed by combinations whose business is not regulated by statute. Counsel for the government questions these statements on the ground that they assume "purely altruistic motives." We do not agree. Of course, the object was not altruistic; the defendants wished primarily to make money for themselves; there is no sentiment in business; but they reasoned, no doubt, that if they kept their rates so regulated in co-ordination with European rates as to give a United States shipper reasonable assurance as to what he had to meet in competition and a fair parity as to rates, and also gave him proper and sufficient sailings with opportunity of changing engagements, the trade would be stimulated, would grow more readily than under the old uncertain conditions, and with its growth the combination would gather in its share of the financial results. The event seems to have justified their expectations. In the mere initiation and carrying out of the enterprise outlined above we see no unreasonable or abnormal restraint of trade.

[3] It is contended that the rates charged by the combination have been unreasonable. Examination of the testimony does not persuade us to this conclusion. Conditions of carriage on the ocean are peculiar. Its waterways are open to all. Tramps and chartered vessels may pass from port to port without acquiring franchises or condemning rights of way. In one sense, as a witness graphically expressed it, "ocean freights are as unstable as the water itself." Regular rates, normally reasonable, are not to be held unreasonable because at some time and place one or more tramp steamers are willing to cut them deeply rather than sail to their next port in ballast. A test sometimes used when inquiring into reasonableness of rates is the cost of service. Thus tested, the evidence indicates that the rates charged by the combination, regulated as they were in co-ordination with European rates, as a rule covered merely cost of service and a reasonable profit; indeed, a small profit, for the competing line, which shaded down defendant's rates.very little, ran frequently at a loss. Testing the rates by comparison with general ocean freights leads to a similar conclusion; such increase of rates as there has been from time to time seems to have been entirely normal following the upward movement of general ocean freight rates.

[4] It is contended that the system of rebates adopted by the combination was a restraint of trade. Rebates at a stated percentage were given to exclusive shippers. Their payment was deferred so that it could be determined at the close of a rebate period whether the shipments of the concern asking for it had really been exclusive. It is, of course, desirable for a shipper to know in advance what rates he is to be charged; in like manner, it is desirable for a carrier to know as definitely as it can what amounts of cargo it may expect it will have to handle in a given period. These rebates were not secret, nor were they confined to a favored few; they were uniform, were open to all, and all were invited to avail of them. The arrangement is probably as old as trade itself. One natural result of it would seem to be stability in sailings and service—both desirable for trade—which might not otherwise be maintained.

If the price of a unit of cargo space be assumed to be 50 cents, the 10 per cent. rebate brings it down to 45 cents. Since the line has been doing business with the 10 per cent. rebate, it must be assumed that (in the case taken as an illustration) 45 cents per unit is remunerative; that it covers cost and a reasonable profit. It does not seem to us, however, necessarily to follow that the 45 cents would be remunerative if it were not coupled with the agreement for exclusive shipments. A line providing regular sailings and undertaking to furnish sufficient space will presumably learn by experience enough of conditions at the several ports at different seasons to enable it to calculate with reasonable accuracy what amount of cargo it may expect from its shippers for any particular sailing. Making provision accordingly, the vessel sailing will take her departure with substantially a full cargo. But if, when she reaches port, it is discovered that the calculations as to expected cargo were correct, but that some of her largest regular shippers had sent their merchandise off the week before by some tramp steamer, the regular vessel will have to sail with much unfilled cargo space. A few experiences of this sort might well involve a loss equal to, if not in excess of, the 10 per cent. We think the two things, rebate and exclusive shipments, are so closely and normally coupled together that in substance the situation is the same as it is when a lower price per unit is quoted for large shipments than for small ones. Such differentiation of price charged between large and small shipments is not unreasonable. Int. C. C. v. B. & O. R. R., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699.

[5] It is charged that defendants have refused to carry cargo at their own berth rates, when there was unengaged space in their vessels. There is no attempt to prove this against all the defendants. Between one of them and the single shipper who makes the charge there was generated from prior transactions, occurring before the combination, a degree of heat, which has probably warped the testimony on both sides as to this refusal. The one side, admitting refusal in a few instances, asserts that there was not unengaged space at the time of refusal, an assertion not necessarily proved false by the vessel's subsequently sailing with some free space; prior engagements may have been canceled. Witnesses for the shipper admit that their tenders of cargo were in the hope of "making out a case," either for action for treble damages or the initiation of this suit by the United States. The evidence is generally unsatisfactory, and it is hard to say where the truth lies; but, on the whole, we are inclined to condemn such practices by granting an injunction against the combination of defendants and its component members prohibiting refusal to receive cargo offered at their regular rates, unless for good cause shown.

In view of the fact that the logic of events has turned this investigation into an autopsy, instead of a determination of live issues, it seems unnecessary to discuss the persuasiveness of the proofs offered to show that the percentage of outward cargo from the United States carried by defendants grew from 51 per cent. in 1908 to 54.7 per cent. in 1912.

There may be a decree for injunction as indicated supra, without costs; in all other respects the bill is dismissed.

Petition Against American-Asiatic Company.

[6] This is a suit, similar to the one above considered, brought under the Sherman Anti-Trust Act against a combination of the ocean steamship lines running from New York and Boston to ports in the Far East and return. There are 11 corporations defendant, 8 British, 2 United States and 1 German. The acts complained of are the usual ones, conferences, agreements, pooling arrangements, regulation of number of vessels employed, of ports visited, and of sailing dates, regulation of rates, provisions for rebates, not secret but open to all and uniform, etc. All of these, or some of them, it is contended, constitute a restraint of trade and an attempt to monopolize under the act. From a study of the multitudinous decisions, not always harmonious, construing this act, the conclusion is reached that a violation of the act is not made out by theories of what will be the result upon trade and commerce of agreements entered into by defendants, or upon presumptions as to what may have been done under such agreements. Some actual unreasonable interference with the natural course of trade must be shown by proof.

In most, if not in all, cases of this character, many of the witnesses called by the government necessarily come from the offices of the defendants. From them only can it be best established what agreements were made and what action under such agreements was taken by the parties thereto. In all cases to which attention has been called, however, this testimony is supplemented by other evidence given by witnesses who complain of some injury; some one asserts that the rates charged him are excessive, or that his business has been in some way interfered with or harassed or hampered by defendant's conduct.

No such witness has appeared in this case; no shipowner, no shipper or consignee, no manufacturer, merchant, or trader, large or small, in the United States or in the Far East, is here with any complaint. Persons engaged in the trade which, it is alleged, is restrained, sit mute; every one seems to be reasonably well satisfied with existing conditions except the government, which contends that the agreements themselves carried out according to their terms, constitute a violation of the act, i. e. (as it is now construed), that they evidence an "unreasonable restraint of trade." It further suggests as a reason for dissolving the combination that, when the Panama Canal is in full operation, "there is no reason to suppose that traffic through (it) would escape the domination of defendants, if they were able to control it."

When from carriers and former carriers and prospective carriers of merchandise between the specified ports, and from persons interested in the manufacture, transportation, sale, and purchase of such merchandise, there comes no complaint, it seems a fair inference that whatever restraints may have resulted from defendant's combination and conduct are merely the usual, normal, and reasonable restraints against which it has been held the Sherman Act is not directed.

[7] Defendant's conference agreement contains a provision for "fighting ships." If there were evidence that any steps had ever been taken towards putting one on, we should be inclined to grant an injunc-

tion similar to the one we granted in United States v. Hamburg American Co. et al. (D. C.) 216 Fed. 971; but, since there is no such evidence in this case, we see no reason for granting that relief.

The bill is dismissed as to all the defendants. All concur.