# FEDERAL MARITIME BOARD v. ISBRANDTSEN COMPANY, INC., ET AL.

No. 73.   Argued December 11, 1957.—Decided May 19, 1958.*

---

*Together with No. 74, *Japan-Atlantic and Gulf Freight Conference et al.* v. *United States et al.,* also on certiorari to the same Court.

*Warner W. Gardner* argued the causes for the Federal Maritime Board, petitioner in No. 73 and respondent in No. 74. With him on the brief were *E. Robert Seaver, Robert E. Mitchell, Edward Aptaker* and *Edward Schmeltzer.*

*Elkan Turk* argued the cause for petitioners in No. 74. With him on the brief were *James M. Landis, Wallace M. Cohen, Seymour J. Rubin, Carl A. Auerbach, Herman Goldman, Benjamin Wiener* and *Elkan Turk, Jr.*

*Philip Elman* argued the causes for the United States and the Secretary of Agriculture, respondents in both cases. On the brief were *Solicitor General Rankin, Assistant Attorney General Hansen, Daniel M. Friedman, Robert L. Farrington, Neil Brooks* and *Donald A. Campbell.*

*John J. O'Connor* argued the causes for the Isbrandtsen Co., Inc., respondent in both cases. With him on the brief were *John J. O'Connor, Jr.* and *Robert J. Crotty.*

*John R. Mahoney, Elmer C. Maddy, Alan B. Aldwell, Walter Carroll, Allen E. Charles* and *David Orlin* filed a brief in both cases for the Steamship Conferences et al., as *amici curiae,* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Isbrandtsen Co., Inc., filed a petition in the United States Court of Appeals for the District of Columbia Circuit to review, under 5 U. S. C. § 1034, an order of the Federal Maritime Board [1] approving a rate system proposed by the Japan-Atlantic and Gulf Freight Confer-

---

[1] 4 F. M. B. 706. The Federal Maritime Board and its predecessors are hereinafter referred to as "the Board." Its predecessors were the United States Shipping Board (1916 to 1933); the United States Shipping Board Bureau in the Department of Commerce (1933 to 1936); and the United States Maritime Commission (1936 to 1950).

ence (the Conference).[2] Under the proposed system a shipper would pay less than regular freight rates for the same service if he signs an exclusive-patronage contract with the Conference. Contract rates would be set at levels 9½ percent below noncontract rates. The Court of Appeals[3] set aside the Board's order on the ground that this system of dual rates was illegal *per se* under § 14 of the Shipping Act, 1916, 39 Stat. 733, as amended, 46 U. S. C. § 812 Third.[4] We granted certiorari. 353 U. S. 908.

---

[2] The Federal Maritime Board was named a respondent in Isbrandtsen's petition. The United States was also named as statutory respondent pursuant to 5 U. S. C. § 1034 but, appearing by the Department of Justice, joined Isbrandtsen in attacking the Board order. The Secretary of Agriculture intervened and joined in the Justice Department's brief. The Conference intervened by leave of the court. The same parties are before this Court.

[3] 99 U. S. App. D. C. 312, 239 F. 2d 933.

[4] Section 14 provides:

"No common carrier by water shall, directly or indirectly, in respect to the transportation by water of passengers or property between a port of a State, Territory, District, or possession of the United States and any other such port or a port of a foreign country—

"First. Pay or allow, or enter into any combination, agreement, or understanding, express or implied, to pay or allow a deferred rebate to any shipper. The term 'deferred rebate' in this chapter means a return of any portion of the freight money by a carrier to any shipper as a consideration for the giving of all or any portion of his shipments to the same or any other carrier, or for any other purpose, the payment of which is deferred beyond the completion of the service for which it is paid, and is made only if, during both the period for which computed and the period of deferment, the shipper has complied with the terms of the rebate agreement or arrangement.

"Second. Use a fighting ship either separately or in conjunction with any other carrier, through agreement or otherwise. The term 'fighting ship' in this chapter means a vessel used in a particular trade by a carrier or group of carriers for the purpose of excluding, preventing, or reducing competition by driving another carrier out of said trade.

"Third. Retaliate against any shipper by refusing, or threatening

484

The Conference is a voluntary association of 17 common carriers by water serving the inbound trade from Japan, Korea, and Okinawa to ports on the United States Atlantic and Gulf Coasts. Five of the carriers are American lines, eight are Japanese, and four are of other nationalities. The Conference presently operates under a Board-approved Conference Agreement made in 1934. Prior to World War II, the Conference had no direct liner competition and little tramp competition.

After the war, Isbrandtsen entered the trade as the sole non-Conference line maintaining a regular berth service in the Japan-Atlantic trade. From 1947 to early 1949, Isbrandtsen operated from Japan to Atlantic Coast ports via the Suez Canal. Since 1949 Isbrandtsen has operated an approximately fortnightly service from Japan to United States Atlantic Coast ports via the Panama Canal as part of its Eastbound, Round-the-World Service.[5]

Although Conference membership is open to any common carrier regularly operating in the trade, Isbrandtsen has refused to join. Isbrandtsen's practice, between 1947

to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment, or for any other reason.

"Fourth. Make any unfair or unjustly discriminatory contract with any shipper based on the volume of freight offered, or unfairly treat or unjustly discriminate against any shipper in the matter of (a) cargo space accommodations or other facilities, due regard being had for the proper loading of the vessel and the available tonnage; (b) the loading and landing of freight in proper condition; or (c) the adjustment and settlement of claims.

"Any carrier who violates any provision of this section shall be guilty of a misdemeanor punishable by a fine of not more than $25,000 for each offense."

[5] Isbrandtsen's vessels are not equipped with refrigerated space or silkrooms, as are many of the Conference vessels, and do not compete for cargoes requiring these facilities.

and March 12, 1953, was to maintain rates at approximately 10 percent below the corresponding Conference rates. The general understanding of shippers and carriers in the trade was that Isbrandtsen underquoted Conference rates by 10 percent. This practice of undercutting Conference rates during the years 1950, 1951, and 1952, captured for Isbrandtsen 30 percent of the total cargo in the trade although Isbrandtsen provided only 11 percent of the sailings.[6]

Since outbound tonnage from the United States exceeds the inbound tonnage, the Japan-Atlantic and Gulf trade is presently overtonnaged, and both Isbrandtsen and Conference vessels have had substantial unused cargo space after loading cargoes in Japan. Total sailings in the trade rose from 109 in 1949 to more than 300 in 1953. (Cf. note 6.) The re-entry of the Japanese lines in the trade after World War II, four in 1951 and four in 1952, greatly contributed to the excess of tonnage. For the years 1951, 1952, and the first 6 months of 1953, the Japanese lines carried approximately 15 percent, 49 percent, and 66 percent, respectively, of the trade's total liner cargo. For the years 1950, 1951, 1952, and the first 6 months of 1953, American flag lines, including

---

[6] The comparative sailings and carryings are indicated in the following table:

| Calendar year | Number of sailings | | | Cargo carried (revenue tons) | | | Average carryings per sailing | | Percentage of total liner cargo | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Is-brandt-sen | Conf. | Total | Is-brandt-sen | Conf. | Total | Is-brandt-sen | Conf. | Is-brandt-sen | Conf. |
| 1949 | 6 | 103 | 109 | 18,099 | 135,635 | 153,734 | 3,016 | 1,317 | 12 | 88 |
| 1950 | 21 | 137 | 158 | 120,381 | 229,829 | 350,210 | 5,780 | 1,678 | 34 | 66 |
| 1951 | 21 | 174 | 195 | 93,450 | 219,343 | 312,793 | 4,450 | 1,261 | 30 | 70 |
| 1952 | 24 | 221 | 245 | 98,834 | 281,308 | 380,142 | 4,118 | 1,273 | 26 | 74 |
| 1953 — 6 months | 12 | 153 | 165 | 37,308 | 189,503 | 226,811 | 3,109 | 1,239 | 16 | 84 |

Isbrandtsen but excluding two others, carried 53 percent, 46 percent, 34 percent, and 21 percent respectively.

When, in late 1952, Isbrandtsen announced a plan to increase sailings from two to three or four sailings a month, the Conference foresaw a further increase in Isbrandtsen's participation which, because of the nationalistic preference of Japanese shippers, would probably be at the expense of the non-Japanese Conference lines. To meet this outside competition the Conference first attempted, in November of 1952, a 10-percent reduction in rates, but Isbrandtsen answered with a reduction of its rates 10 percent under the Conference rates.

On December 24, 1952, the Conference proposed the dual-rate system and filed its plan with the Board as required by the Board's General Order 76, 46 CFR § 236.3, which permitted proposed rate changes to become effective after 30 days unless postponed by the Board on its own motion or on the protest of interested persons. Protests were filed by Isbrandtsen and the Department of Justice. The Secretary of Agriculture intervened as an interested commercial shipper opposed to the proposal. On January 21, 1953, the Board ordered a hearing on the protests but refused, pending the Board's determination, to suspend operations of the dual-rate system. Isbrandtsen, therefore, filed a petition in the United States Court of Appeals for the District of Columbia Circuit for a stay of the Board's order insofar as it authorized the Conference to institute the dual-rate system. The court announced on February 3, 1953, that the Board's order would be stayed and the stay was entered on March 23, 1953.[7]

[7] On January 21, 1954, the Court of Appeals handed down its final decision holding that § 15 of the Shipping Act required the Board to hold a hearing on the proposed dual-rate system before approval. 93 U. S. App. D. C. 293, 211 F. 2d 51.

The Conference response to the stay was to open rates to allow each line to fix its own rates. At a meeting on March 12, 1953, the Conference voted to open Conference rates on 10 of the major commodities moving in the trade. The action was primarily directed at Isbrandtsen's competition; the Board found that "it was hoped that the rate war would lead to Isbrandtsen's joining the Conference or to the institution of the dual rate system or other system." On succeeding dates in the spring of that year, the Conference opened rates on most of the major items in the trade. In the resulting rate war, the level of rates dropped to about 80 percent and later to about 30 percent to 40 percent of the pre-March 12 rates. In some instances, rates fell below handling costs. Isbrandtsen attempted to keep on a competitive basis in the rate war but, when pegging of minimum rates in May did not improve its position, in July it set its rates at 50 percent of the pre-March 12 Conference rates. Since that date, Isbrandtsen has carried little cargo in the trade. Meanwhile the Board proceeded with the hearing and issued its report on December 14, 1955, followed on December 21, 1955, and January 11, 1956, by orders approving the proposed dual-rate system.[8] The question for our decision is whether the Court of Appeals correctly set aside the Board's orders.

It has long been almost universal practice for American and foreign steamship lines engaging in ocean commerce to operate under conference arrangements and agreements. At least by 1913 it was recognized that such agreements might run counter to the policy of the antitrust laws; several cases were pending against foreign and domestic water carriers for alleged violations of the

---

[8] The Board did modify the exclusive-patronage contracts to delete from their coverage refrigerated cargoes for which Isbrandtsen did not compete.

Sherman Act. The House Committee on Merchant Marine and Fisheries of the 62d Congress, of which committee Representative J. W. Alexander was Chairman, undertook an exhaustive inquiry into the practices of shipping conferences. The work of this Committee is set forth in two volumes of hearings,[9] a volume of diplomatic and consular reports, and a fourth volume containing the Committee's report, known as the Alexander Report.[10] Contemporaneously a British inquiry was conducted by the Royal Commission on Shipping Rings. The Royal Commission's report was available to the House Committee and was considered by it in formulating recommended legislation. See Hearings, at 369.

Both inquiries brought to light a number of predatory practices by shipping conferences designed to give the conferences monopolies upon particular trades by forestalling outside competition and driving out all outsiders attempting to compete. The crudest form of predatory practice was the fighting ship. The conference would select a suitable steamer from among its lines to sail on the same days and between the same ports as the non-member vessel, reducing the regular rates low enough to capture the trade from the outsider. The expenses and losses from the lower rates were shared by the members of the conference. The competitor by this means was caused to exhaust its resources and withdraw from competition.

More sophisticated practices depended upon a tie between the conference and the shipper. The most widely used tie, because the most effective, was the system of deferred rebates. Under this system a shipper

---

[9] Proceedings of the House Committee on the Merchant Marine and Fisheries in the Investigation of Shipping Combinations under House Resolution 587, Hearings, 62d Cong. (Hereinafter "Hearings.")

[10] H. R. Doc. No. 805, 63d Cong., 2d Sess. (Hereinafter "Report.")

signed a contract with the conference exclusively to patronize its steamers, and if he did so during the contract term, and for a designated period thereafter, a rebate of a certain percentage of his freight payments was made to him at the end of the latter period. In this way, the shipper was under constant obligation to give his patronage exclusively to the conference lines or suffer the loss of the rebate, which often amounted to a considerable sum.

But the Alexander Committee also found evidence of other predatory practices. Shippers who patronized outside competitors were denied accommodations for future shipments even at full rates of freight, or were discriminated against in the matter of lighterage and other services. Outside competition was also met by dual-rate contracts, by contracts with large shippers at lower rates for volume shipments, and by contracts with American railroads giving conference vessels preference in the handling of cargoes at the docks, and delivering through shipments of freight to conference vessels. Report, at 287–293.

The Alexander Committee recommended against a flat prohibition of shipping combinations because it found that the restoration of unrestricted competition among carriers would operate against the public interest by depriving American shippers of desirable advantages of conference arrangements honestly and fairly conducted. The Committee mentioned advantages such as "greater regularity and frequency of service, stability and uniformity of rates, economy in the cost of service, better distribution of sailings, maintenance of American and European rates to foreign markets on a parity, and equal treatment of shippers through the elimination of secret arrangements and underhanded methods of discrimination." *Id.*, at 416. The Committee believed that these advantages could be preserved "only by permitting the

several lines in any given trade to cooperate through some form of rate and pooling arrangement under Government supervision and control," *ibid.*, and further "that the disadvantages and abuses connected with steamship agreements and conferences as now conducted are inherent, and can only be eliminated by effective government control; and it is such control that the Committee recommends as the means of preserving to American exporters and importers the advantages enumerated, and of preventing the abuses complained of." *Id.,* at 418.

In passing the Shipping Act of 1916, 39 Stat. 728, 733, as amended, 46 U. S. C. § 812 Third, Congress followed the basic recommendations of the Alexander Committee.[11] The Act does not forbid shipping conferences in foreign commerce but requires all conference agreements covering the subjects mentioned in § 15 to be submitted for Board approval.[12] No power to fix rates is granted to

---

[11] H. R. Rep. No. 659, 64th Cong., 1st Sess. 27; see S. Rep. No. 689, 64th Cong., 1st Sess. 7. The Alexander Report was submitted in 1914 to the 63d Congress and a bill to carry out its recommendations was introduced but not passed. H. R. 17328, 63d Cong., 2d Sess. In the following Congress substantially the same bill was reintroduced, H. R. 15455, 64th Cong., 1st Sess., and became the Shipping Act of 1916.

[12] Section 15 provides:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an

the Board. Subject to familiar limitations, the power vested in the Board is to approve agreements not found to be unjustly or unfairly discriminatory in violation of §§ 16 and 17 or otherwise in violation of the Act. Approved agreements are exempted from the antitrust laws.

But it must be emphasized that the freedom allowed conference members to agree upon terms of competition subject to Board approval is limited to the freedom to agree upon terms regulating competition among themselves. The Congress in § 14 has flatly prohibited practices of conferences which have the purpose and effect of stifling the competition of independent carriers. Thus the deferred-rebate system (§ 14 First) and the fighting ship (§ 14 Second) are specifically outlawed. Similarly, § 14 Third prohibits another practice, common in 1913: to "[r]etaliate against any shipper by refusing . . . space accommodations when such are available . . ."; that prohibition, moreover, is enlarged to condemn retaliation not only when taken "because such shipper has patronized any other carrier" but also when taken because the shipper "has filed a complaint charging unfair treatment, *or for any other reason.*" (Emphasis added.)

---

exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.

"The Board may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

. . . . . .

"Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of [the Antitrust Acts] . . . ." 39 Stat. 733, as amended, 46 U. S. C. § 814.

But in addition to these specifically proscribed abuses, Congress, as previously noted, was aware that other devices—some known but not so widely used, and others that might be contrived—might be employed to achieve the same results. Therefore, coordinate with these three clauses aimed at specific practices, a fourth category, couched in general language, was added: "resort to other discriminating or unfair methods . . . ." In the context of § 14 this clause must be construed as constituting a catchall clause by which Congress meant to prohibit other devices not specifically enumerated but similar in purpose and effect to those barred by § 14 First, Second, and the "retaliate" clause of § 14 Third.

The reason the "resort to" clause was added to the statute as an independent prohibition of practices designed to stifle outside competition is revealed in the Alexander Report. From information contained in the Report of the British Royal Commission and a communication from a major New York carrier organization, the Alexander Committee was aware that the outlawing of the deferred-rebate system would lead conferences to adopt a contract system to accomplish the same result. The British Royal Commission believed that ties to shippers were justified and that the abuses of the deferred-rebate system should be tolerated in the interest of achieving a strong conference system. Hearings, 369–381. However, the Alexander Committee, and the Congress in adopting the Committee's proposals, reached a different conclusion. Congress was unwilling to tolerate methods involving ties between conferences and shippers designed to stifle independent carrier competition. Thus Congress struck the balance by allowing conference arrangements passing muster under §§ 15, 16, and 17 limiting competition among the conference members while flatly outlawing conference practices designed to

destroy the competition of independent carriers.[13]   Ties
to shippers not designed to have the effect of stifling out-
side competition are not made unlawful.   Whether a
particular tie is designed to have the effect of stifling
outside competition is a question for the Board in the
first instance to determine.

Since the Board found that the dual-rate contract of
the Conference was "a necessary competitive measure to
offset the effect of non-conference competition" required
"to meet the competition of Isbrandtsen in order to
obtain for its members a greater participation in the
cargo moving in this trade," [14] it follows that the contract
was a "resort to other discriminating or unfair methods"
to stifle outside competition in violation of § 14 Third.

The Board argues, however, that Congress, although
aware of the use of such contracts, did not specifically
outlaw them and therefore implicitly approved them.
But the contracts called to the attention of Congress bear
little resemblance to the contracts here in question.
Those joint contracts were described by the Alexander
Committee as follows:

> "Such contracts are made for the account of all the
> lines in the agreement, each carrying its proportion
> of the contract freight as tendered from time to time.
> The contracting lines agree to furnish steamers at

---

[13] Both the section which became § 14 Third and the section which
became § 15, as originally proposed, used the language "discriminat-
ing or unfair." H. R. 17328, 63d Cong., 2d Sess.   The bill which
became the Shipping Act, H. R. 15455, 64th Cong., 1st Sess., sub-
stituted "unjustly discriminatory or unfair" in § 15 but left untouched
"discriminating or unfair" in § 14 Third.

[14] The Board estimated that Isbrandtsen would lose approximately
two-thirds of its 1952 volume.   ". . . [I]t [is] probable that Is-
brandtsen will retain 10 percent or more of the cargo moving in the
trade as against the 26 percent carried by it in 1952 . . . ."
4 F. M. B. 706, 737, 1956 Am. Mar. Cas. 414, 451.

regular intervals and the shipper agrees to confine all shipments to conference steamers, and to announce the quantity of cargo to be shipped in ample time to allow for the proper supply of tonnage. The rates on such contracts are less than those specified in the regular tariff, but the lines generally pursue a policy of giving the small shipper the same contract rates as the large shippers, i. e. are willing at all times to contract with all shippers on the same terms." Report, at 290.

These contracts were very similar to ordinary requirements contracts. They obligated all members of the Conference to furnish steamers at regular intervals and at rates effective for a reasonably long period, sometimes a year. The shipper was thus assured of the stability of service and rates which were of paramount importance to him. Moreover, a breach of the contract subjected the shipper to ordinary damages.

By contrast, the dual-rate contracts here require the carriers to carry the shipper's cargo only "so far as their regular services are available"; rates are "subject to reasonable increase" within two calendar months plus the unexpired portion of the month after notice of increase is given; "[e]ach Member of the Conference is responsible for its own part only in this Agreement"; the agreement is terminable by either party on three months' notice; and for a breach, "the Shipper shall pay as liquidated damages to the Carriers fifty percentum (50%) of the amount of freight which the Shipper would have paid had such shipment been made in a vessel of the Carriers at the Contract rate currently in effect." Until payment of the liquidated damages the shipper is denied the reduced rate, and if he violates the agreement more than once in 12 months, he suffers cancellation of the agreement and the denial of another until all liquidated damages have

been paid in full. Thus under this agreement not only is there no guarantee of services and rates for a reasonably long period, but the liquidated-damages provision bears a strong resemblance to the feature which Congress particularly objected to in the outlawed deferred-rebate system. Certainly the coercive force of having to pay so large a sum of liquidated damages ties the shipper to the Conference almost as firmly as the prospect of losing the rebate. It would be anomalous for Congress to strike down deferred rebates and at the same time fail to strike down dual-rate contracts having the same objectionable purpose and effect. Events have proved the accuracy of the prediction that the outlawing of the deferred-rebate system would lead conferences to adopt a contract system, as here, specially designed to accomplish the same result.

It is urged that our construction "produces a flat and unqualified prohibition of *any* discrimination by a carrier for *any* reason" and converts the rest of the statute into surplusage. But that argument overlooks the revealed congressional purpose in § 14 Third. That purpose, as we have said, was to outlaw practices in addition to those specifically prohibited elsewhere in the section when such practices are used to stifle the competition of independent carriers. The characterizations "unjustly discriminatory" and "unjustly prejudicial" found in other sections (§§ 15, 16 and 17) imply a congressional intent to allow some latitude in practices dealt with by those sections, but the practices outlawed by the "resort to" clause of § 14 Third take their gloss from the abuses specifically proscribed by the section; that is, they are confined to practices designed to stifle outside competition.[15]

---

[15] The Court of Appeals made a partial application of the rule of *ejusdem generis* and related the "resort to" clause to retaliation, holding the dual-rate contract or suit was retaliatory and within the ban of the section. The Board urges that the Court of Appeals

Petitioners argue that our construction of § 14 Third is foreclosed by this Court's decisions in *United States Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474, and *Far East Conference* v. *United States*, 342 U. S. 570. A reading of those opinions immediately refutes any suggestion either that this issue was expressly decided in those cases or that our holding here is not fully consistent with the disposition of those cases. In *Cunard* the petitioner had filed a complaint in the District Court alleging that respondents had conspired to maintain "a general tariff rate and a lower contract rate, the latter to be made available only to shippers who agree to confine their shipments to the lines of respondents." 284 U. S., at 479. The differentials were alleged to be unrelated to volume or regularity of shipments, but to be wholly arbitrary and unreasonable and designed "for the purpose of coercing shippers to deal exclusively with respondents and refrain from shipping by the vessels of petitioner, and thus exclude it entirely from the carrying trade between the United States and Great Britain." *Id.*, at 480. An injunction was sought under the Sherman and Clayton Acts. The Court held that the questions raised by this complaint were within the primary jurisdiction of the Shipping Board and therefore the courts could not entertain the suit until the Board had considered the matter. In *Far East Conference* the Court similarly held that the Board's primary jurisdiction precluded the United States

did not carry the rule of *ejusdem generis* far enough, that by carrying the rule "a hand's breadth farther" and also relating—and limiting— the "resort to" clause to the refusal of space accommodations and *similar services* to shippers, the dual-rate contract falls without the prohibition because the contract is concerned only with *charges for services* and not with *denial of services*. We do not believe that these constructions can be reconciled with the language of the statute or the scope of the congressional plan.

from bringing antitrust proceedings against a shipping conference maintaining dual rates.

The Board and the Conference argue that, if the Court in these earlier cases had thought that § 14 Third in any way makes dual rates *per se* illegal and thus not within the power of the Board to authorize, it would not have found it necessary to require that the Board first pass upon the claims. But in the *Cunard* case the Court said:

> "Whether a given agreement among such carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal." 284 U. S., at 485.

Similarly, in the *Far East Conference* case:

> "The Court [in *Cunard*] thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. *This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined.* Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for

ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." 342 U. S., at 574–575. (Emphasis added.)

It is, therefore, very clear that these cases, while holding that the Board had primary jurisdiction to hear the case in the first instance, did not signify that the statute left the Board free to approve or disapprove the agreements under attack. Rather, those cases recognized that in certain kinds of litigation practical considerations dictate a division of functions between court and agency under which the latter makes a preliminary, comprehensive investigation of all the facts, analyzes them, and applies to them the statutory scheme as it is construed. Compare *Denver Union Stock Yard Co.* v. *Producers Livestock Marketing Assn., ante,* p. 282. It is recognized that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern. Cases are not decided, nor the law appropriately understood, apart from an informed and particularized insight into the factual circumstances of the controversy under litigation.

Thus the Court's action in *Cunard* and *Far East Conference* is to be taken as a deferral of what might come to be the ultimate question—the construction of § 14 Third—rather than an implicit holding that the Board could properly approve the practices there involved. The holding that the Board had primary jurisdiction, in short, was a device to prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court of the scope and

meaning of the statute as applied to those particular circumstances. To have held otherwise would, necessarily, involve the Court in comparatively abstract exposition.

This consideration, moreover, is particularly compelling in light of our present holding. Since, as we hold, § 14 Third strikes down dual-rate systems only where they are employed as predatory devices, then precise findings by the Board as to a particular system's intent and effect would become essential to a judicial determination of the system's validity under the statute. In neither *Cunard* nor *Far East Conference* did the Court have the assistance of such findings on which to base a determination of validity. We conclude, therefore, that the present holding is not foreclosed by these two cases.[16]

Finally, petitioners argue that this Court should not construe the Shipping Act in such a way as to overturn the Board's consistent interpretation. "[T]he rulings, interpretations and opinions of the [particular agency] . . . , while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power

---

[16] Certainly it must be assumed that the Court would refrain from settling *sub silentio* an issue of such obvious importance and difficulty plainly requiring a clearly expressed disposition.

Petitioners' reliance on *Swayne & Hoyt, Ltd., v. United States,* 300 U. S. 297, is similarly misplaced. In that case the Court upheld the administrative determination that a dual-rate system gave an "undue or unreasonable preference or advantage" under § 16 of the Shipping Act. Because the Court sustained the finding as supported by substantial evidence it did not need to reach the more contentious problem of whether that particular contract was illegal under § 14 Third.

to persuade, if lacking power to control." *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140. But we are here confronted with a statute whose administration has been shifted several times from one agency to another, and it is by no means clear that the Board and its predecessors have taken uniform and consistent positions in regard to the validity of dual-rate systems under § 14 Third.[17] See *Isbrandtsen Co.* v. *United States,* 96 F. Supp. 883, 889–891. In view of the fact that in the present case the dual-rate system was instituted for the purpose of curtailing Isbrandtsen's competition, thus becoming a device made illegal by Congress in § 14 Third, we need not give controlling weight to the various treatments of dual rates by the Board under different circumstances.

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

The Court today holds that any dual system of international steamship rates tied to exclusive patronage contracts that is designed to meet outside competition— howsoever justified it may be as a reasonable means of counteracting cutthroat competition—violates § 14 of the Shipping Act of 1916 [1] and cannot be approved by the Federal Maritime Board pursuant to § 15 of that Act. The Court thus outlaws a practice that has prevailed among international steamship conferences for half a century,[2] that is presently employed by at least half of

---

[17] Compare, *e. g., Eden Mining Co.* v. *Bluefields Fruit & S. S. Co.,* 1 U. S. S. B. 41, and *Contract Routing Restrictions,* 2 U. S. M. C. 220, 226–227, with *W. T. Rawleigh Co.* v. *Stoomvart,* 1 U. S. S. B. 285, 290.

[1] 39 Stat. 728, 733, as amended, 46 U. S. C. § 812.

[2] See, *e. g.,* agreements set forth at pp. 262–263 of Hearings before the House Committee on the Merchant Marine and Fisheries in the Investigation of Shipping Combinations, 62d Cong.

the hundred-odd conferences subject to Board jurisdiction,[3] and that has been found by the Board in this case to decrease the probability of ruinous rate wars in the shipping industry.[4] In doing so, the Court does more than set aside a weighty decision of the Federal Maritime Board. It could do so only by rendering meaningless two prior decisions in which this Court respected the power given by Congress to the Board, within the usual limits of administrative discretion, to approve or disapprove such agreements.

The agreement involved in this case is typical of the contracts used by the loose associations of steamship lines known as "conferences" to effectuate their dual-rate systems. See Marx, International Shipping Cartels, 207–210. The contracting shipper agrees to forward all of his shipments moving in the "trade" or route of the conference by bottoms of conference members (§ 1). In return, the conference members, "so far as their regular services are available," agree to carry the shipper's goods at rates below those charged to noncontracting shippers; rates are subject to reasonable increase upon specified notice (§ 2). The conference members agree to maintain service adequate to the reasonable requirements of the trade, and if they fail to provide the shipper (who may ordinarily select which of the conference members' vessels will carry his goods) with needed space, he may obtain space from nonconference carriers (§ 4). If the shipper makes any shipments in violation of the agree-

---

[3] Respondent Isbrandtsen, in its petition to the Court of Appeals to review the order of the Federal Maritime Board, stated (at par. 10b) that "[o]f the about one hundred seventeen steamship freight conferences organized pursuant to Section 15 of the Shipping Act, and subject to the jurisdiction of the Board, about sixty-two conferences presently employ that system . . . ." See also Marx, International Shipping Cartels, 207.

[4] 4 F. M. B. 706, 737, 739–740, 1956 Am. Mar. Cas. 414, 451, 454.

ment, he must pay as liquidated damages 50 percent of the amount of freight he would have paid if he had made the shipment under the contract, and he is not entitled to contract rates until he pays these damages (§ 5). If the shipper violates the agreement more than once in a twelve-month period, the agreement is canceled, and no new agreement will be entered into until all damages are paid (*ibid.*). Either party may cancel the agreement on three months' notice (§ 9), and any dispute arising out of the agreement is to be submitted to arbitration (§ 10).

Such differences as exist among the dual-rate systems that have for long been in wide use in international ocean transportation are irrelevant if each such system is to be judged by the new test laid down by the Court: is it aimed at meeting outside competition? Of course these exclusive patronage contracts and the dual-rate systems of which they are an integral part are designed to meet nonconference competition. And there should be no doubt that today's decision outlaws such systems. This result cannot be clouded by the Court's reliance upon "findings" of the Board that it

> "consider[s] the inauguration of a dual-rate system to be a necessary competitive measure to offset the effect of non-conference competition in this trade." 4 F. M. B. 706, 736, 1956 Am. Mar. Cas. 414, 450.

and that

> "a reduction in the amount of conference sailings or other solution to the overtonnaging problem would not mitigate the conference's need to meet the competition of Isbrandtsen in order to obtain for its members a greater participation in the cargo moving in the trade." 4 F. M. B., at 737, 1956 Am. Mar. Cas., at 451.

These statements in the Board's opinion are nothing more than a recognition of the dual-rate system as a device for

meeting outside competition; they provide a basis neither for distinguishing the situation before us from any other familiar use of a dual-rate system nor for concluding that the conference members in this case instituted the system in order to "stifle" outside competition.

While limits have been imposed upon enterprise in meeting competition, which is itself the governing principle of our economic system, these limits, embodied in the antitrust laws, were found to be inapplicable to, because destructive of our national interest in, the international ocean transportation industry. The United States obviously could not completely regulate the foreign carriers with whom American carriers compete (not to mention the carriers that serve foreign shippers with whom American shippers compete). In view of the prevailing characteristics of the industry, it early became apparent that it would, on the whole, be in the national interest to tolerate some practices of steamship lines that in other industries would be deemed inadmissible. For the alternative, so it was concluded, would be to put it within the power of unregulated foreign carriers seriously to injure American firms—both carriers and shippers—if not, indeed, to put them out of business. And so, in the development of a scheme for regulating this international industry, self-protective measures by way of collective action were not left to the condemnation of the Sherman and Clayton Acts. In order to appreciate the Shipping Act of 1916 as an attempt to balance the need for some regulation with the economic and political objections to sweeping the shipping industry under the antitrust concept, the circumstances that begot the Act must be recalled. .

The second half of the Nineteenth Century saw a tremendous rise in the development of ocean transportation by steamship. Unfortunately, the supply of available cargo space increased during this period much more

rapidly than the demand for it. The inevitable result was cutthroat competition among steamship owners. This in turn was followed by mergers of ownership and by concerted efforts among individual owners to limit competition. The practices by which this end was pursued led to abuses and demands for their correction, to which a number of governments at the turn of the century began to direct their attention. A series of investigations of rates and practices in various parts of the British Empire was followed by the appointment in 1906 of the Royal Commission on Shipping Rings, which rendered its report in 1909. See, generally, Marx, *supra*, at 45–50; see also Johnson and Huebner, Principles of Ocean Transportation, 263–302. In the United States, the Department of Justice in 1911 brought two proceedings against three steamship conferences to enjoin competitive practices in alleged violation of the Sherman Act, *United States* v. *Prince Line, Ltd.,* 220 F. 230; *United States* v. *Hamburg-American S. S. Line,* 216 F. 971.[5]

The terms of the resolutions that gave rise to the historic investigation of shipping combinations by the House Committee on the Merchant Marine and Fisheries in 1912–1913, H. Res. 425 and H. Res. 587, 62d Cong., 2d Sess., 48 Cong. Rec. 2835–2836, 9159–9160, manifest the concern of Congress over these steamship conferences and their practices. The investigation was thorough and detailed. The Committee, under the chairmanship of Representative Joshua W. Alexander of Missouri, elicited great quantities of relevant data from shippers, carriers, trade organizations and the Departments of State and Justice, including copies of many kinds

---

[5] On appeal, the very limited decrees obtained by the Government against some members of two of the conferences were reversed, 239 U. S. 466, 242 U. S. 537, and the suits directed to be dismissed on the score of mootness because of World War I.

of agreements among carriers and between carriers and shippers, and it held extensive hearings in January–March, 1913. Fully considered were exclusive patronage agreements between shippers and conferences providing for a dual rate, see, *e. g.*, Hearings before the House Committee on the Merchant Marine and Fisheries in the Investigation of Shipping Combinations, 62d Cong., 248, 254, 262–263; see also *id.*, at 246, 263.

In 1914 the Committee submitted its comprehensive report. In summarizing the competitive methods used by steamship conferences in the American foreign trade, the report discussed, under the heading *"Meeting the competition of lines outside of the conference,"* deferred rebate systems, the use of fighting ships, agreements with American railroads, and such types of contracts with shippers as individual requirements contracts, contracts giving preferential rates to large shippers, and the following:

> *"(a) Joint contracts made by the conference as a whole.*—Such contracts are made for the account of all the lines in the agreement, each carrying its proportion of the contract freight as tendered from time to time. The contracting lines agree to furnish steamers at regular intervals and the shipper agrees to confine all shipments to conference steamers, and to announce the quantity of cargo to be shipped in ample time to allow for the proper supply of tonnage. The rates on such contracts are less than those specified in the regular tariff, but the lines generally pursue a policy of giving the small shipper the same contract rates as the large shippers, i. e. are willing at all times to contract with all shippers on the same terms." Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H. R. Doc. No. 805, 63d Cong., 2d Sess. 290.

There can be no doubt that the Committee was amply alive to the primary purpose of the dual-rate system. But it did not, in subsequently discussing (*id.*, at 304–307) the "Disadvantages of Shipping Conferences and Agreements, as Now Conducted," make any reference to the system as such, although it dealt extensively and disapprovingly, on the basis of evidence put before it, with such practices as deferred rebates, fighting ships, and retaliation against shippers for airing grievances. Nor were there any strictures against dual-rate systems in the survey of recommendations of witnesses at the hearings for corrective legislation (*id.*, at 307–314), although it was there noted that recommendations were made in favor of prohibitions against deferred rebates and retaliation by refusal of accommodations to a shipper because "he may have shipped by an independent line, or may have filed a complaint charging unfair treatment, or for other unjust reasons." *Id.*, at 313.

In making its own recommendations (*id.*, at 415–421), the Committee recognized that steamship lines almost universally form conferences and enter into agreements for the purpose (among others) of "meeting the competition of non-conference lines." *Id.*, at 415. The Committee recognized that it had to choose between prohibition of these conferences or subjection of them to government supervision.

> "It is the view of the Committee that open competition can not be assured for any length of time by ordering existing agreements terminated. The entire history of steamship agreements shows that in ocean commerce there is no happy medium between war and peace when several lines engage in the same trade. Most of the numerous agreements and conference arrangements discussed in the foregoing report were the outcome of rate wars, and represent a truce between the contending lines." *Id.*, at 416.

To prohibit existing arrangements, said the Committee, would be to invite rate wars leading to monopoly or to the exposure of American shippers and lines to disastrous competition with foreign shippers and lines. Among the complaints relating to existing conditions was "the unfairness of certain methods—such as fighting ships, deferred rebates, and threats to refuse shipping accommodations—used by some conference lines to meet the competition of nonconference lines." *Id.*, at 417. The Committee concluded that the system of conferences and agreements was not to be uprooted. Its disadvantages and abuses must be curbed by effective government control.

Among the specific recommendations of the Committee were that carriers be required to file for approval with the regulatory agency (the Committee recommended use of the Interstate Commerce Commission) any agreements among themselves or with shippers, with the agency being empowered to cancel agreements it found to be "discriminating or unfair in character, or detrimental to the commercial interests of the United States" (*id.*, at 420); that the agency be empowered to investigate and institute proceedings concerning rates that are "unreasonably high, or discriminating in character as between shippers" (*ibid.*), and

> ". . . That the use of 'fighting ships' and deferred rebates be prohibited in both the export and import trade of the United States. Moreover, all carriers should be prohibited from retaliating against any shipper by refusing space accommodations when such are available, or by resorting to other unfair methods of discrimination, because such shipper has patronized an independent line, or has filed a complaint charging unfair treatment, or for any other reason." *Id.*, at 421.

The cautious generality of the latter portion of this last recommendation (and, surely, of the legislative provision based on it) doubtless reflects a feeling on the part of the Committee that many shippers refrained from describing the various forms of and reasons for retaliation against them by carriers, for fear that they would subsequently be retaliated against for making the disclosures. See, *e. g., id.,* at 5.

The report of the Committee was filed in February 1914, and four months later Representative Alexander introduced a bill, H. R. 17328, 63d Cong., 2d Sess., incorporating its recommendations. The bill provided, among other things, that carriers be required to file for approval with the Interstate Commerce Commission any of a wide variety of agreements, that the Commission be empowered to cancel or modify agreements that it found "discriminating or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or that it may find to operate to the detriment of the commerce of the United States, or that may be in violation of this Act," and that agreements when approved should be exempt from the antitrust laws (§ 3). Where the Commission was of the opinion that rates, charges, classifications, regulations or practices were "unjust or unreasonable," it was empowered to determine and enforce what would be just and reasonable under the circumstances (§ 7). And the bill (§ 2) provided that it should be a misdemeanor (punishable by fine of up to $25,000) for any carrier to allow deferred rebates, use a fighting ship, or:

> "Third. Retaliate against any shipper by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or

unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment or for any other reason."

As no action was taken on H. R. 17328 in 1914, it was reintroduced by Mr. Alexander in the 64th Congress late in 1915 as H. R. 450. Shortly thereafter he introduced H. R. 10500, a bill "To establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its territories and possessions, and with foreign countries, and for other purposes." That bill authorized the Board to purchase or charter commercial vessels to be leased to private concerns in peacetime and used as a naval auxiliary in wartime; the bill also (§§ 9, 10) provided for very general regulation by the Board of the ocean transportation industry.

Approximately two months later, in April 1916, Mr. Alexander introduced H. R. 14337, which adapted his earlier regulatory bill (H. R. 450) to the administrative framework of the Shipping Board bill (H. R. 10500). The bill was considered in committee with a view to substituting its provisions for the general regulatory language of §§ 9 and 10 of the Shipping Board bill. See Hearings before the House Committee on the Merchant Marine and Fisheries on H. R. 14337, 64th Cong., 1st Sess. 5. In these hearings, there was no discussion of the "retaliation" provision of the bill; attention was concentrated on its more controversial aspects, such as the power of the Board to regulate rates.

At the close of these hearings, in early May 1916, a new Shipping Board bill, H. R. 15455, in which the substitution of the more detailed regulatory provisions had been made, was introduced by Mr. Alexander. The bill added a "Fourth" to the prohibitions against deferred

rebates, fighting ships and retaliation: unfair or unjustly discriminatory contracts with or treatment of shippers under specified circumstances; the standard ("discriminating and unfair") in the provision empowering the Board to cancel or modify agreements became "unjustly discriminatory and unfair." The bill was promptly reported out of the Merchant Marine and Fisheries Committee with a report that set forth *in extenso* the recommendations in the 1914 report of the investigation of the shipping industry. H. R. Rep. No. 659, 64th Cong., 1st Sess. 27–31. The debate in the House centered on the ship purchase and lease provisions of the bill, and the bill passed the House with no detailed consideration of the regulatory provisions. In the Senate, the hearings before the Committee on Commerce were also concerned primarily with the ship purchase and lease provisions, as were the floor debates. Once again, the Committee report set forth the recommendations arising out of the 1914 investigation. S. Rep. No. 689, 64th Cong., 1st Sess. 7–11. With no relevant amendment to the regulatory portions of the bill, H. R. 15455 passed the Senate and became law in September of 1916. 39 Stat. 728.

As enacted, then, the statute provided for the following scheme of regulation. Carriers subject to the Act must file with the Board copies of agreements establishing (*inter alia*) preferential or cooperative arrangements. Such of these as the Board finds "to be unjustly discriminatory or unfair . . . or to operate to the detriment of the commerce of the United States, or to be in violation of this Act," it may disapprove, cancel or modify; all others it must approve, and those approved are exempt from the antitrust laws (§ 15). As to any "rate, fare, charge, classification, tariff, regulation, or practice" of carriers that the Board finds to be unjust or unreasonable, it may take corrective measures (§ 18). As an exception to, or qualification upon, this scheme, certain practices

were specifically outlawed and may not, therefore, be approved by the Board: to allow deferred rebates, use fighting ships,

> ". . . Retaliate against any shipper by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment, or for any other reason, . . . ."

and treat or contract with shippers in certain unfair or unjustly discriminatory ways; violation of this provision is a misdemeanor punishable by a fine of up to $25,000 (§ 14).[6]

The form that this regulation takes, considered in light of its legislative background, makes clear the congressional purpose. It was found that abuses and discriminations were inherent in the international shipping trade when it was conducted on the basis of cooperation among competitors. It was further found that the alternative to cooperation was cutthroat competition leading to monopoly and, more particularly, working to the serious detriment of American carriers and shippers and to the advantage of their foreign competitors. The conclusion was that the system of cooperation must be domesticated

---

[6] It is worth noting that in §§ 14 Fourth and 15 the statute speaks in terms of "unjust" discrimination, a standard to which it was quite clearly the legislative purpose for the Board to give substance and meaning. Congress had no intention of condemning all of the practices described by the very general language of the two provisions; it relied on the Board to prevent only those that are unwarranted by the competitive situation in which they are found. But in § 14 Third no such qualification was adopted, for the kind of "discriminating and unfair methods" toward which Congress was directing its attention had been clearly identified (*i. e.*, by retaliation against shippers), and they were to be flatly prohibited irrespective of the circumstances in which they might be practiced.

and exposed to, and policed by, a continuing process of regulation. Only the flagrant abuses were flatly prohibited. The pervading purpose of the Shipping Act is to be found in a statement made in the House debate by Representative Burke, a majority member of the Alexander Committee during both the investigation and the consideration of the various bills:

"Your committee at the conclusion of such hearings and after consideration and due deliberation made its report to Congress upon the subject with many valuable recommendations. Among the recommendations made in such report to Congress were that laws should be passed prohibiting the grossest and most vicious of such unfair practices . . . .

.        .        .        .        .

"It was found by your committee that many of the unfair practices had become so firmly established and contained in many instances elements of usefulness that, with the exception of some of the more prominent ill practices, it was considered that a system of regulation and control of water transportation would be for the best interest of both the public and those interested in water transportation." 53 Cong. Rec. 8095.

It is important to keep in mind the relation of this scheme of regulation to the antitrust laws. Prior to the enactment of the Shipping Act, the ocean transportation industry was, of course, subject to the antitrust laws, and, indeed, as has been noted, proceedings under the Sherman Act had been brought against several conferences by the Government. Congress might have provided that, in addition to being subjected to the general surveillance involved in a comprehensive pattern of regulation, the steamship owners must continue to conform to the affirmative policy in favor of a high level of competition that

underlies the antitrust laws. Such was the condition in which legislation had placed the railroads. They were subject to both Interstate Commerce Commission regulation and the outlawry of the Sherman Act. *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505. Not until 1920 were agreements among rail carriers excepted from the antitrust laws. § 407, Transportation Act of 1920, 41 Stat. 456, 480, amending § 5 of the Interstate Commerce Act, 24 Stat. 379, 380. With respect to ocean transportation, however, Congress from the beginning chose to exempt agreements among carriers and between carriers and shippers from the antitrust laws. They thus rejected court-determined competition and preferred to rely upon regulation under an expert administrative agency.

It is in the light of this background that we must consider § 14 Third of the Shipping Act of 1916, which both the Court of Appeals and this Court have construed as prohibiting the dual-rate contract system. The section imposes a heavy fine for conduct it makes criminal and so should be strictly construed. See *Yates* v. *United States,* 354 U. S. 298, 304–305. It deserves narrow construction also on the ground that it is an undoubted exception to a comprehensive and complex scheme of regulation by the Board. For it must be construed not as though it were an isolated piece of writing but as part of a reticulated scheme of government for the shipping industry. No form of conduct should be brought within its terms that was not designed to be included. As the foregoing survey of the legislative history demonstrates, there is no evidence of such purpose with respect to the dual-rate contract system. The evidence in fact points to the intention of its exclusion.

Under no fairly applicable meaning of the word "retaliation" can the conclusion of the Court of Appeals, that

the initiation and maintenance of a dual-rate contract system is retaliation, be sustained. It is clear from the congressional history that the framers of the legislation were concerned with certain forms of conduct, notably refusal of available accommodations, directed against shippers because they had previously done such things as shipping by an independent line or publicly filing complaints against carriers. The very concept of retaliation is that the retaliating party takes action against the party retaliated against after, and because of, some action of the latter. In the dual-rate contract system, there is nothing of this "getting even"; the parties simply enter into an agreement that is designed to guide their future conduct but in no way depends upon or arises out of past conduct. It does violence to the English language—and certainly to the duty of reading congressional language in context—to characterize such a contractual arrangement as "retaliation." As conduct relating to the competitive struggle between carriers combined in a conference and those who prefer to stay out—yes; as an act of reprisal—no.

But if the dual-rate contract system is not "retaliation," then it does not violate § 14 Third, for it seems evident that that section was directed only at retaliation. It is, indeed, rather inartfully drawn, but under the circumstances, and particularly in light of the legislative background, its ambiguities should be resolved in favor of the narrower construction. The recommendation of the Alexander Committee, *supra,* a body on which Congress placed an extraordinarily high degree of reliance with respect to the regulatory aspects of the Shipping Bill, contemplated nothing but "retaliation." When, four months later, the recommendation had been put into the language of proposed legislation, it took substantially the form it takes in the statute as enacted. No doubt, the intention to limit the application of the provision to "retaliation"

is not so clear in the statutory language as it was in the recommendation; however, since there is no evidence of purposefulness in this change, and no apparent reason for it, the alteration in language should not be regarded as having effected a decisive change in the substance of the provision. Attaching such drastic significance to this change in wording has no supporting reason and is contradicted by the underlying philosophy of the legislation. This conclusion is emphasized by the fact that after the change the Committee Reports in both Houses of Congress quoted the language of the recommendation in support of the proposed legislation without qualification. And in the House debate, when Representative Alexander was briefly summarizing the provisions of the bill, he said, in describing the provision that became § 14 Third, nothing more than that it "forbids retaliation against shippers who patronize other carriers, or complain of unfair treatment by refusing, or threatening to refuse, space accommodations when available, or by other unfair practices . . . ." 53 Cong. Rec. 8080. Surely, when there is nothing in the legislative history to suggest that Congress wished to prohibit the dual-rate contract system of which they were fully aware, and everything to suggest that § 14 Third was designed to respond solely to an entirely different problem, that section cannot be stretched to embrace that practice and thereby to undercut the rationale of the legislation.

The Court's construction makes of the latter portions of § 14 Third a general catchall. The relevant words, as abstracted from the entire provision, would be these: "No common carrier by water shall, directly or indirectly . . . resort to . . . discriminating or unfair methods . . . for any . . . reason." Such a provision—even if it be limited to conduct designed to "stifle" competition—would not only make the remainder of § 14 redundant but would be inconsistent with the whole

philosophy, not to say the language, of much of the regulatory portion of the Shipping Act. There is nothing in the words of the statute or in its congressional background to indicate that Congress intended to bury such a broad prohibition in the third portion of a four-part penal section. Moreover, as noted above, the most probable explanation for the generality of the language in § 14 Third is that Congress sought to cover forms of retaliation that shippers had been afraid to bring to the legislators' attention.

Nor is there any merit to the suggestion that if Congress made "deferred rebates" unlawful, the practice of dual-rate contracts—although not specifically prohibited—should also be unlawful because it has "the same objectionable purpose and effect." This mode of approach is a judicial utilization of the salesmanship that offers something as "just as good." This Court certainly has not the power to say that conduct is unlawful simply because it is "just as bad" as some conduct that Congress has specifically prohibited. The principal basis that the Alexander Committee set forth for its conclusion that deferred rebates were objectionable was precisely that the rebates were deferred. The Committee, in outlining the objections that had been made to steamship agreements, noted that "[b]y deferring the payment of the rebate until three or six months following the period to which the rebate applies ship owners effectively tie the merchants to a group of lines for successive periods." Report, *supra,* at 307. The Committee recited the contention that "the ordinary contract system does not place the shipper in the position of continual dependence that results from the deferred rebate system" (*ibid.*); it is not unlikely that they had in mind the dual-rate contract system. This Court in *Swayne & Hoyt, Ltd.,* v. *United States,* 300 U. S. 297, adopted that point of view when it said (300 U. S., at 307, n. 3):

"The Committee recognized that the exclusive contract system does not necessarily tie up the shipper as completely as 'deferred rebates,' since it does not place him in 'continual dependence' on the carrier by forcing his exclusive patronage for one contract period under threats of forfeit of differentials accumulated during a previous contract period."

Twice this Court has rejected the contention that it now accepts. Twice this Court has held that the Shipping Act of 1916 did not render illegal *per se* a dual-rate contract system enforced by a combination of steamship carriers essentially like the one now before the Court, whereby lower rates are tied to an agreement for exclusive carriage. Such were the decisions, upon full consideration, in *United States Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474, in 1932 and again in *Far East Conference* v. *United States,* 342 U. S. 570, in 1952 by a wholly differently constituted Court. In both these cases the claim was that such a dual-rate system constituted a combination in violation of the Sherman Act, for which relief by way of an injunction could be had by a competing carrier outside the conference, as in the *Cunard* case, and by the United States, as in the *Far East Conference* case, under § 4 of the Sherman Act. The immediate issue in both cases was, of course, the applicability of the principle of "primary jurisdiction"—that is, whether the legality of a dual-rate system could be adjudicated by a United States District Court without a determination by the Federal Maritime Board as to whether "the matters complained of" (*United States Navigation Co.* v. *Cunard S. S. Co.*, *supra,* at 478) and whether the dual-rate system "on the merits" (*Far East Conference* v. *United States, supra,* at 573) offend the Shipping Act of 1916. The doctrine of "primary jurisdiction" was recognized by Mr. Chief Justice Taft as an achievement whereby its author, Mr. Chief Justice White, "had more to do with placing this vital

part of our practical government on a useful basis than any other judge." (257 U. S. xxv.) The Court's opinion makes of it an empty ritual.

By virtue of these two decisions, an independent shipowner who claimed to be hurt by the operation of a dual-rate contract system, employed as a competitive measure against him by a shipping conference, could not bring his complaint to court as might a manufacturer hurt by an analogous combination competitor. Such a shipowner would have to appeal to the Federal Maritime Board, as did Isbrandtsen. The ensuing Board proceedings would probably be similar to those in this case. On Isbrandtsen's protests, filed January 12, 1953, and amended on January 19, hearings were conducted before a Board Examiner from October 5 to December 23, 1953, in which was compiled a record of over 4,500 pages of testimony and over 150 exhibits. The examiner rendered his recommended decision on September 13, 1954, but on October 6 the Board remanded the record for supplemental findings of fact; these supplemental findings were served on January 17, 1955. Eleven months later the Board filed its detailed, comprehensive report approving the conference's dual-rate system (as amended in accordance with the Board's report) as not unjustly discriminatory or unfair, nor likely to operate to the detriment of the commerce of the United States, nor in violation of the Shipping Act. But all this elaborate process and determination are legally meaningless. The agency is made to serve as a circumlocution office. The sole function of this carnival of procedural emptiness is that of a formal preliminary to a suit in a federal court. For such a suit, the Court now holds, is to proceed in complete disregard of all the hearing, weighing and interpreting of evidence before the Board. The Court is to make a ruling of law with entire indifference to all the findings of the expert body set up to make appropriate findings on the basis of

the law's policy. Surely it is a form of playfulness to make resort to the Board a prerequisite when the judicial determination of law could have been made precisely as though there had been no proceeding before the Board. This is to make a mockery of the doctrine of primary jurisdiction and to interpret the decisions in the *Cunard* and *Far East Conference* cases as utterly wasteful futilities.

Until today the doctrine of "primary jurisdiction" was not an empty ritual. Its observance in scores of cases was not a wasteful futility. In denying to the District Courts jurisdiction in situations like those in the *Cunard* and *Far East Conference* cases the doctrine of primary jurisdiction was not devised for the purposeless delay of giving the same jurisdiction to Courts of Appeals, on condition that they use the administrative agency as a sterile conduit to them. Such a view would denigrate and distort the significance of one of the most important movements in our law. Legal scholars have rightly compared it to the rise of equity, a view endorsed by this Court through Mr. Chief Justice Stone, himself a scholar. See *United States* v. *Morgan,* 307 U. S. 183, 191. The utilization of these administrative agencies is a legislative realization, judicially respected, that the regulatory needs of modern society demand law-enforcing tribunals other than the conventional courts. The doctrine of primary jurisdiction, based as it is on the discharge of functions for which courts normally have neither training and experience nor procedural freedoms, is an essential aspect of this modern administrative law. It is a means of achieving the proper distribution of the law-enforcing roles as between administrative agencies and courts. It gives these agencies the necessary scope for exploring a wide realm of facts, not to be confined within the exclusionary rules of evidence controlling proceedings in courts, to weigh such facts with an expert's understanding and

to choose between allowable inferences where wise choice so often depends on informed judgment.[7]   These agencies do not supplant courts.   They are subject to what may broadly be called the judicial Rule of Law.   Appeal lies to courts to test whether an agency acted within its statutory bounds, on the basis of rational evidence supporting a reasoned conclusion, and ultimately satisfies the constitutional requirement of due process.   Within these limits, a large range of discretion is entrusted to administrative agencies to make effective the social and economic policies adopted by Congress in the myriad concrete situations calling for their application.   Whether rates are reasonable, whether discriminations are fair, whether particular combined economic arrangements are justified, whether practices that would, for industry generally, fall

---

[7] "[The] differences in origin and function [between court and agency] preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.   Thus, this Court has recognized that bodies like the Interstate Commerce Commission, into whose mould Congress has cast more recent administrative agencies, 'should not be too narrowly constrained by technical rules as to the admissibility of proof,' *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25, 44, should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.   Compare *New England Divisions Case,* 261 U. S. 184.   To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play.   They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion.   But to assimilate the relation of these administrative bodies and the courts to the relationship between lower and upper courts is to disregard the origin and purposes of the movement for administrative regulation and at the same time to disregard the traditional scope, however far-reaching, of the judicial process.   Unless these vital differentiations between the functions of judicial and administrative tribunals are observed, courts will stray outside their province and read the laws of Congress through the distorting lenses of inapplicable legal doctrine." *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 143–144.

afoul the Sherman Act are permissible under a legislative regime for a particular industry that to that extent supersedes the antitrust laws—these and like questions come within the operation of the doctrine of primary jurisdiction, and it limits the power of courts to pass on their merits.

Contrariwise, where a decision of a case depends on determination of a question of law as such, either because of explicit statutory outlawry of some specific conduct or by necessary implication of judicial power because not involving the exercise of administrative discretion or the need of uniform application of specialized competence, the doctrine of primary jurisdiction has no function, because there is no occasion to refer a matter to the administrative agency. *Great Northern R. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285 (reaffirmed in *United States* v. *Western Pacific R. Co.,* 352 U. S. 59, 69); *Texas & Pacific R. Co.* v. *Gulf, C. & S. F. R. Co.,* 270 U. S. 266; *Civil Aeronautics Board* v. *Modern Air Transport, Inc.,* 179 F. 2d 622, 624–625; see Davis, Administrative Law, 666–668. The course of decisions was accurately summarized in *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.,* 341 U. S. 246, 254: ". . . we know of no case where the court has ordered reference of an issue which the administrative body would not itself have jurisdiction to determine in a proceeding for that purpose." It would be a travesty of law and an abuse of the judicial process to force litigants to undergo an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency. Such, however, is the result in this case.

The *Cunard* and *Far East Conference* decisions mean nothing if they do not mean that the denial of jurisdiction to the District Courts to entertain the suits in those

cases and their reference to the Federal Maritime Board, and the holding that the complaints against the dual-rate system in those two cases must be passed on by the Board, constituted the plainest possible recognition that it was for the Board to approve or disapprove the dual-rate contract system complained of, and, therefore, that the practice was not illegal as a matter of law—that is, by virtue of a statutory condemnation. In both cases the Court's attention was directed to the claim of *per se* illegality. In both cases the plaintiffs urged that, since the dual-rate contract system violated § 14, the Board was without power to approve it. Brief for Petitioner, pp. 47–56, *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474; Brief for United States, pp. 22–23 (incorporating by reference Brief for United States, pp. 21–45, *A/S J. Ludwig Mowinckels Rederi* v. *Isbrandtsen Co.,* 342 U. S. 950), *Far East Conference* v. *United States,* 342 U. S. 570. See also *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474, 478 (argument of petitioner's counsel). And in *Far East Conference,* the claim that now prevails was a main ground of dissent. See 342 U. S., at 578–579.[8] When an issue is squarely and

[8] The Court in the *Cunard* case discussed the claim in the following terms:

"It is said that the agreement referred to in the bill of complaint cannot legally be approved. But this is by no means clear. . . . [W]hatever may be the form of the agreement, and whether it be lawful or unlawful upon its face, Congress undoubtedly intended that the board should possess the authority primarily to hear and adjudge the matter. For the courts to take jurisdiction in advance of such hearing and determination would be to usurp that authority. Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications." 284 U. S., at 487.

It may be noted that, after this Court ordered the dismissal of the

fully presented to the Court and its disposition is essential to the result reached in a case, the issue is decided, whether the Court says much or little, whether the opinion is didactic or elliptical. Otherwise very few opinions in which Mr. Justice Holmes spoke for the Court, in most instances tersely and often cryptically, would have formulated decisions.

Nor can these cases be distinguished on their facts. The complaints in both cases alleged that the conferences had initiated the dual-rate contract system in order to eliminate competition. See *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474, 479–480; Transcript of Record, p. 6, *Far East Conference* v. *United States,* 342 U. S. 570. And the dual-rate agreement involved in *Far East Conference* was, if anything, more coercive and more closely analogous to a system of deferred rebates than is the one involved in the cases before the Court. It provided (§ 4) that if a shipper violated the agreement, the agreement was void, and the shipper became liable to pay "additional freight on all commodities theretofore shipped with such carriers for a period not exceeding twelve months immediately preceding the date of such shipment, at the non-contract rate or rates . . . ." Transcript of Record, p. 18. Such an accumulation of potential liability was much more likely to result in "continual dependence" on the conference than is the liquidated damages provision in the agreement before us. The latter provides for damages of 50 percent of the freight that would have been paid under the agreement (*i. e.,* at the lower, or contract rate) for the shipment made in violation of the agreement; the agreement

complaints in the *Cunard* and *Far East Conference* cases, the complaining party in neither case initiated proceedings before the Board concerning the dual-rate system involved. The Government has, however, intervened in Board proceedings involving the systems of other conferences, as it did in the instant case.

does not become void on account of a single violation. There is no basis for concluding that these damages are unreasonably high or that they do not bear a rational relation to the actual loss a carrier sustains when he is denied a shipment to which his contract entitles him.

Since this Court has twice rejected the theory that dual-rate contract systems violate § 14 of the Shipping Act, and since there is nothing in that statute or its legislative history to suggest that those cases were wrongly decided in the light of new knowledge not before the Court when they were decided, the question in this case is, as it was in the earlier two cases, one lying within the Board's administrative discretion. As I see no reason for over-turning the detailed, well-reasoned report of the Board in these proceedings, I am of opinion that the decision of the Court of Appeals should be reversed.

MR. JUSTICE HARLAN, dissenting.

Except in one respect, I agree with the dissenting opinion of MR. JUSTICE FRANKFURTER. I do not think that this Court's decisions in *United States Navigation Co.* v. *Cunard Steamship Co.*, 284 U. S. 474, and *Far East Conference* v. *United States*, 342 U. S. 570, have the effect which that opinion attributes to them. Despite the logic of the argument flowing from the doctrine of primary jurisdiction, and the lack of any substantial factual distinction between the agreements in those cases and in this one, I am unable to read *Cunard* and *Far East Conference* as having determined, without any discussion, the far-reaching question which has been decided today. See especially *Cunard*, 284 U. S., at 483–484, 487. On the merits, however, I dissent for the reasons set forth in MR. JUSTICE FRANKFURTER's opinion.