**RISS & COMPANY, Inc., Plaintiff,**

v.

**ASSOCIATION OF AMERICAN RAILROADS et al., Defendants.**

Civ. A. No. 4056–54.

United States District Court
District of Columbia.
Jan. 16, 1959.

See also 162 F.Supp. 69.

A. Alvis Layne, Jr., Lester M. Bridgeman, Robert L. Wright, Washington, D. C., for plaintiff Riss & Co., Inc.

Hugh B. Cox, James H. McGlothlin, Washington, D. C., for defendants Baltimore & O. R. Co. and others.

Francis M. Shea, Lawrence J. Latto, Washington, D. C., for defendants Atlantic Coast Line R. Co. and others.

Stuart S. Ball, Richard J. Flynn, Chicago, Illinois, for defendants Atchison, T. & S. F. R. Co. and others.

Martin A. Meyer, Jr., Washington, D. C., for defendant Virginian Ry. Co.

Edward K. Wheeler, Robert G. Seaks, Washington, D. C., for defendants Chesapeake & O. Ry. Co. and New York Cent. R. Co.

H. Graham Morison, Newell A. Clapp, Washington, D. C., for defendant Louisville & N. R. Co.

John D. Lane, Fred S. Gilbert, Jr., Washington, D. C., for defendants Boston & Maine R. R. and New York, N. H. & H. R. Co.

J. Raymond Hoover, Washington, D. C., for defendants Grand Trunk Western R. Co. and Central Vermont Ry., Inc.

SIRICA, District Judge.

On August 8, 1958, the United States Court of Appeals for the District of Columbia remanded this case to the District Court with directions to vacate its order of May 26, 1958, and to reconsider petitioners' motion to suspend proceedings in the light of said order.

In the early part of 1958, petitioners moved to suspend all proceedings in this

antitrust litigation except discovery not connected with this motion, and urged the Court to refer to the Interstate Commerce Commission one of the issues set forth in the complaint regarding rate-making, pursuant to agreements on procedure filed with the Commission, so that the Court might obtain a ruling on whether these joint rate reductions were immunized from the operation of the antitrust laws. Extensive briefs were filed and the Court heard oral arguments. After delivering an oral opinion from the bench, the Court denied the motion in an order entered May 26, 1958. Relying strongly on a recent Supreme Court decision not mentioned by the Court in its oral opinion, most of the railroad defendants then petitioned for a writ of certiorari from the Court of Appeals and asked that Court to reverse this Court's order and to direct this Court to suspend proceedings and refer the above issue to the Commission. The Court of Appeals granted the writ, —— F.2d ——, but declined to rule on the merits. Instead, it remanded the case to this Court with directions to vacate the order of May 26, and to reconsider petitioners' motion in the light of its order and of the Supreme Court's recent holding in Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926.

Petitioners then requested the Court of Appeals to clarify certain language in its order of August 8, 1958. —— F. 2d ——. The Court granted this request in an order dated December 16, 1958. —— F.2d ——.

Before discussing the legal issues raised by this motion, it is necessary to summarize the background of this complex case so that all issues may be viewed in their proper context.

In 1954, Riss & Company, Inc., a common carrier by motor vehicle in interstate commerce, filed this civil antitrust suit, seeking an injunction and $90,000,-000 in treble damages. It alleged that beginning in or about 1950, defendants, most of whom are railroad companies, had agreed and conspired in unreasonable restraint of trade and commerce to injure or destroy plaintiff's business and to acquire a monopoly of land transportation of property in the United States, and had thus violated Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1, 2).

Plaintiff alleges it has been a common carrier of property by motor vehicle since 1927 and operates as authorized by the Interstate Commerce Commission throughout 22 states plus the District of Columbia. It uses over 800 truck units and employs over 2,000 persons. Riss also has alleged that during the years from 1950 to 1953, inclusive, it was one of the five largest interstate motor carriers in the United States in terms of gross revenues and is, and has been for several years, one of the largest motor carriers of military supplies, including ammunition and explosives, for the Armed Forces. About 58 first class railroad companies, several joint railroad organizations and trade associations and one public relations firm are defendants in this action.

In order to effectuate the object of the alleged conspiracy, plaintiff charges that defendants employed various means, some of which are cited as examples in the complaint. Defendants are accused of having carried on a program of soliciting, directly as well as indirectly through "front" organizations, the elected and appointed officials of various states to take steps leading to the revocation and cancellation of the interstate operating authority held by plaintiff. In 1952, it is alleged that some of the defendants employed a public relations expert to persuade the Public Utilities Commission of Ohio to file proceedings before the Interstate Commerce Commission looking toward the cancellation of plaintiff's operating authority.

By similar methods of solicitation, according to the complaint, officials of states, cities and towns through which plaintiff operates, were urged by defendants to enact statutes, ordinances and regulations designed to unduly hamper the operations of the plaintiff and to

render them economically unfeasible, such as by imposing unreasonably low weight limits on truck shipments or by banning the use by plaintiff's vehicles of certain important highway routes. Defendants are also alleged to have urged, directly and indirectly through "front" organizations, that state officials carry out a campaign of unusually strict enforcement of statutes, ordinances and regulations particularly aimed at plaintiff's vehicles such as by urging the Public Utilities Commission of Ohio to assign special investigators to follow plaintiff's trucks for hundreds of miles in order to discover possible violations.

Defendants also are alleged to have abused their privilege of intervention in proceedings before the Interstate Commerce Commission. According to plaintiff, defendants joined together to carry on an extensive and vicious campaign of anti-truck propaganda in order to persuade citizens' groups, automobile clubs and other neutral organizations to register their complaints against Riss in the course of proceedings started by Riss before the I.C.C. to obtain new operating authorizations. Other unfair competitive practices, such as circulating and publishing false and malicious statements about Riss and its officers are also charged in the complaint.

According to the complaint, defendants used railroad groups in their public relations campaign as well as "front" organizations whose connection with the railroads would not be known to the public. It is also asserted that defendants tried to infiltrate and make use of several independent public organizations such as the Illinois Parent-Teachers Association and the Congress of Parents and Teachers of Oklahoma in order to achieve their unlawful objectives. Chief reliance, however, is alleged to have been placed on such instrumentalities as "Competitive Transportation Research", "Motor Carrier Bureau" and "Committee on Motor Transportation" set up by defendants, as well as upon other temporary committees and organizations. Plaintiff claims that defendants spent large sums of money, estimated at about $1,000,000 in carrying out their unlawful activities.

In January, 1958, with the permission of the Court, plaintiff filed a supplement to its complaint which is embodied in paragraph 18. Plaintiff claims therein that, pursuant to the unlawful plan described above, defendant railroads submitted to traffic officials of the Department of Defense in 1955 a 40 per cent reduction in rate on the carriage of explosives totaling more than 50,000 pounds by railroads competing with Riss for the same kind of traffic. It is plaintiff's claim that this reduction was intended to accomplish one of the principal objects of the conspiracy; i. e., to exclude plaintiff from the explosives traffic and it has allegedly had that effect with respect to the principal points served by the plaintiff.

Plaintiff further alleges that defendants' conduct has caused serious damage to its business and to its reputation and has forced plaintiff to spend large sums to counteract the effects of defendants' conduct. By way of relief, plaintiff demands the following:

"1. Injunctive relief permanently enjoining and restraining AAR, Western Railways, Presidents Conference and Eastern Railroads, and each of them, from creating or continuing any committees, subcommittees, bureaus, departments, sections, divisions, subdivisions, or other association activity the principal purpose of which is to restrain, impede, impair, hamper, harass or eliminate the competition of plaintiff and of other motor carriers;

"2. Injunctive relief permanently enjoining, restraining and prohibiting defendants and each of them and their officers, directors, agents, servants and employees from agreeing, conspiring or combining to restrain the competition of plaintiff and from conspiring, combining and attempting to monopolize land transportation by the elimination of plaintiff and from perform-

ing any acts in furtherance of such unlawful objects and purpose;

"3. Judgment against defendants and each of them for $90,000,-000, being the amount equal to three times the damages sustained by plaintiff;

"4. Judgment against defendants and each of them for the amount of reasonable attorneys' fees and costs of this action;

"5. Such other and further relief as to the Court may appear just and proper; and

"6. Injunctive relief enjoining the defendant railroads from accepting traffic pursuant to the illegal quotation described in paragraph 18 hereof."

## I.

This is a summary of plaintiff's allegations. In their motion to suspend and to refer the rate reduction issue to the I.C.C., defendants seek to invoke the doctrine of "primary administrative jurisdiction". The defendants contend that a new issue was raised which involves the primary, if not the exclusive, jurisdiction of the Interstate Commerce Commission when plaintiff was allowed by the Court to supplement its complaint and to include in paragraph 18 the allegation that the uniform and concerted rate reduction, which took effect on or about November 20, 1955, was intended to exclude the plaintiff from the business of carrying such shipments of explosives; that said quotation was made for the purpose of effectuating one of the principal objects of the conspiracy, that is the elimination of the plaintiff as a competitor with the railroads for explosives traffic. As a defense to this allegation, it is also argued that the new rates are reasonable and compensatory when all the cost factors are taken into consideration and that, furthermore, the rate quotation was set up according to procedural agreements approved by the Commission and thus is immunized from the operation of the antitrust laws by virtue of 49 U.S.C.A. § 5b(9). It is defendants' position that this matter is extremely technical and complex and thus the Court should obtain the expert opinion of the Commission with respect to defendants' contentions before the case goes to trial.

Plaintiff argues, on the other hand, that it is immaterial whether defendants' act of reducing rates, considered by itself, is covered by prior procedural agreements approved by the Commission or is immunized from the antitrust laws because it is a well-settled principle of law that a lawful act may be properly alleged as a means of effectuating one of the principal objects of the alleged conspiracy; that is, the elimination of plaintiff as a competitor with the railroads for explosives traffic.

These, then, are the basic legal issues before the Court. Certain practical considerations also enter into the case. This private antitrust suit against almost 60 defendants has been on the docket over four years. During that time, five different judges have made rulings on various preliminary motions. In the interest of finally resolving the complex and serious issues raised by this case and of doing so in the spirit of Rule 1 of F.R.Civ.P., 28 U.S.C.A., this Court has set October, 1959, as a tentative time for trial. A great deal of work by both Court and counsel will yet have to be done in order to meet such a schedule, and this date may be delayed because of the recent proceedings in our Court of Appeals. Both sides have requested trial by jury, and have estimated that the trial will last from four to six months. The Court's basic problem is this: Should this important antitrust suit, already more than four years old, and involving issues of serious importance to the national transportation industry, be further delayed for one or perhaps several years in order that the Court might request the expert opinion of the Interstate Commerce Commission as to whether one of many overt acts alleged to have been committed pursuant to a Sherman Act conspiracy ought to be immunized from the operation of the antitrust laws?

The rate reduction issue is raised in paragraph 18 of the complaint as supplemented, which reads as follows:

"18. On or about Oct. 20, 1955, the railroad defendants herein caused to be submitted to traffic officials employed by the Department of Defense a uniform, unpublished rate quotation, by and on behalf of the railroads engaged in carrying explosives traffic in competition with the plaintiff. Said quotation established railroad rates for carrying explosive shipments totalling more than 50,000 pounds which were nearly forty percent below the general level of such rates prevailing for the previous eight years. Said uniform and concerted rate reduction, which took effect on or about November 20, 1955, was intended to exclude the plaintiff from the business of carrying such shipments of explosives and has had that effect with respect to the principal points served by the plaintiff. Said quotation was made for the purpose of effectuating one of the principal objects of the conspiracy charged herein, to wit, the elimination of the plaintiff as a competitor with the railroads for explosives traffic and has substantially injured the plaintiff's business. The Interstate Commerce Commission has no jurisdiction over said quotation and plaintiff will continue to suffer substantial and irreparable injury from said illegal quotation until and unless the acceptance of traffic pursuant thereto is enjoined by this Court."

In its earlier ruling on this motion, this Court was strongly influenced by the decision in Atchison, Topeka and Santa Fe Railway Co. v. Aircoach Transportation Association, Inc., 1958, 102 U.S.App. D.C. 355, 253 F.2d 877, hereinafter referred to as ACTA. On motions by both sides for summary judgment, the District Court, there 154 F.Supp. 106, had ruled that the concerted quotation by railroads under Section 22 of the I.C.C. Act, 49 U.S.C.A. § 22, of certain variable rates and package bids for military passenger traffic were *per se* illegal under the antitrust laws, and that 49 U.S.C.A. § 5b(9) did not grant immunity from these laws.

In reversing, the Court of Appeals held that it could not be said as a matter of law that *all* joint rate reductions under section 22 must be excluded from the class of concerted actions covered by prior procedural agreements approved by the Commission under 49 U.S.C.A. § 5b(9) and, therefore, it was error to hold that all such reductions in rate must be denied immunity from the antitrust laws under 49 U.S.C.A. § 5b(9). Hence, some section 22 rates arrived at by joint action might be within the coverage of prior approved arrangements for rate making and hence might be immunized from the antitrust laws. The Court of Appeals felt that the Commission's prior rulings as to the possible or actual coverage of defendants' conduct by procedural agreements or as to the Commission's power to decide these very questions were not clear and decisive. The Court observed, 253 F.2d at page 885:

"Nevertheless, the questions are appropriate for Commission consideration, even though, as we believe, exclusive primary jurisdiction over either of them does not reside in the Commission by reason of section 5a (7) [49 U.S.C.A. 5b(7)]."

The Court of Appeals then ruled that the District Court should, in its discretion, withhold decision on the interpretation of the I.C.C. Act and the approved procedural agreements until the Commission has had a chance to decide initially whether, in its opinion, the railroad rate reductions can be relieved from the antitrust laws because of coverage by approved agreements.

After discussing the relationship of defendants' practices to unlawful price-fixing, the Court of Appeals then set a limitation on the power of the Commission to resolve the antitrust aspect of the rate practices. It said, 102 U.S.App.D. C. at page 365, 253 F.2d at page 887:

"One further substantive legal question must be considered. Even

though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition of Aircoach, rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach for the section 22 transportation involved. See, by analogy, American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; State of Georgia v. Pennsylvania R., supra, 324 U.S. 439, at page 458, 65 S.Ct. 716, at page 726, 89 L.Ed. 1051; Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, 422; Noerr Motor Freight, Inc. v. Eastern R. R. Pres. Conf., D.C.E.D.Pa., 155 F.Supp. 768, 814–816, 822–825; Parmelee Transp. Co. v. Keeshin, D.C.N.D.Ill., 144 F.Supp. 480, 484; Noerr Motor Freight, Inc. v. Eastern R. R. Pres. Conf., D.C.E.D.Pa., 113 F.Supp. 737, 742–744; Slick Airways, Inc. v. American Airlines, Inc., D.C.D.N.J., 107 F.Supp. 199, 214, appeal dismissed sub nom. American Airlines, Inc. v. Forman, 3 Cir., 204 F. 2d 230, certiorari denied 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336; United States v. Association of American Railroads, D.C.D.Neb., 4 F.R.D. 510, 526. * * * The motion of Railroads is not to be construed as admitting factual *allegations in regard to a purpose to destroy competition which would have the legal result of removing Railroads from any possible protection from the antitrust laws;* nor can Aircoach's motion be construed as abandoning those allegations. Thus, on this aspect of the case, there remains a factual dispute. Moreover, this aspect of the case need not be submitted for consideration or initial decision by the Commission as to either questions of fact or of law.

"There thus arises a matter of procedure. As to this, a discretion must be left to the District Court after hearing the parties. It might be considered preferable, if Aircoach desires to pursue the assertions regarding a purpose to destroy competition, that this branch of the case should be the subject of a hearing, limited to that problem. Should Aircoach prevail Railroads would be liable in damages, and an appropriate injunction also could be granted. Or proceedings in the District Court on this subject could await reference to the Commission of the questions of coverage by statute or approved agreement." (Emphasis supplied.)

The case of American Tobacco Company v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1126, 90 L.Ed. 1575, decided in 1946 and cited above was a criminal action brought under the Sherman Act and the defendants, who were officers of large tobacco companies, were convicted on four counts of an indictment charging conspiracy in restraint of trade, monopolization, attempting to monopolize, and conspiracy to monopolize. In the petition for certiorari the question was limited to "whether actual exclusion of competitors is necessary to the crime of monopolization under Section 2 of the Sherman Act."

At page 809 of 328 U.S., at page 1139 of 66 S.Ct. the Court said:

"It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which

are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. * * *"

The case of State of Georgia v. Pennsylvania Railroad Company, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051, decided in 1945, was a suit by a state charging that the defendant railroads had set up rates that discriminated against the ports and cities of Georgia and greatly hampered the industrial and economic development of the entire state, in violation of the antitrust laws.

One of the defendants' contentions was that the I.C.C. had jurisdiction over these rate matters and had actually approved these rates under I.C.C. Act standards. The court held that carriers are also subject to the antitrust laws. Even though the rates had to be cleared through the I.C.C., it may be that circumstances make these rate agreements restrictive rather than competitive. The court said that a conspiracy to fix rates might be illegal though the rates fixed were reasonable and nondiscriminatory, and, as Mr. Justice Brandeis had said in the Keogh case, Keogh v. Chicago & N. W. R. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183, the fact that rates had been approved by the I.C.C. would not, it seems, bar proceedings by the Government.

The court then stated:

"It is sufficient here to note that we find no warrant in the Interstate Commerce Act and the Sherman Act for saying that the authority to fix joint through rates *clothes with legality a conspiracy to discriminate against a State or a region, to use coercion in the fixing of rates, or to put in the hands of a combination of carriers a veto power over rates proposed by a single carrier.*" (Emphasis supplied.) [324 U.S. 456, 65 S.Ct. 726.]

█ It is clear from the above language in the ACTA case that a court need not refer to the Commission the issue of whether a rate quotation was made as part of a combination or conspiracy to eliminate a competitor. This follows logically because such a joint act if combined with the unlawful intent of eliminating a competitor would fall outside of the immunity granted by 49 U.S. C.A. § 5b(9) regardless of a possible I.C.C. ruling that the methods of arriving at the new rate conformed to prior procedural agreements filed with and sanctioned by the Commission. The Court of Appeals also authorized a separate hearing on the allegations of intent to destroy competition which might, if the defendants in ACTA lost, result in a determination of liability and an award of damages and injunctive relief. Thus, a clear distinction was drawn between the antitrust aspects and the technical rate-making issues in the ACTA case. In ACTA, both aspects grew out of the same type of activity, namely, section 22 rate quotations. The lawfulness of these quotations formed, for all practical purposes, the sole issues of that case. Since the Court of Appeals authorized the District Court, in ACTA, in its discretion, to itself decide the fundamental questions of antitrust liability and damages, it seems to be far more important to follow that reasoning in this case where the technical aspects of section 22 rate-making constitutes only one part of the issue raised by paragraph 18 of the complaint as supplemented and where this rate reduction itself forms only one out of the many overt acts alleged by the plaintiff.

However, in the view of the Court of Appeals, the decision of the Supreme Court in Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926, has modified the holding in ACTA by placing on District Courts a duty under clearly defined conditions to refer certain issues to administrative agencies. The Court of Appeals in its order dated August 8, 1958 stated as follows:

"* * * it is the view of this court that the Isbrandtsen opinion modifies the holding of the Aircoach case by requiring that the issue of the intent and effect of an agreement approved by the Commission must, *in a case where such issue is*

*the sole or dominant issue in the case,* first be referred to the Commission prior to a court determination of whether such agreement violates the anti-trust laws, * * *." (Emphasis supplied.)

Answering defendants' motion for clarification of the above language, the Court of Appeals in an order dated December 16, 1958 stated as follows:

"* * * The intent, however, of the order of August 8 was to assert our view that the Isbrandtsen opinion modifies the holding of the Aircoach case by requiring that the issue of the intent and effect of a rate reduction claimed to have been taken pursuant to procedures set forth in agreements approved by the Commission under Sec. 5a of the Interstate Commerce Act, 49 U.S.C.A. § 5b, must, in a case where such issue is the sole or dominant issue, first be referred to the Commission prior to a court determination of whether such rate reduction violates the anti-trust laws. The "issue" referred to in the order was not intended to mean the issue of the applicability of sec. 5a agreements to the rate reductions."

The Court, in its order of August 8, interpreted Isbrandtsen as applying to a factual situation more in line with the case at bar, and used the following language:

"* * * it is the view of this court that the Isbrandtsen decision does not necessarily require referral to the Commission of issues such as those sought to be referred to the Commission by petitioners' motion *where the agreement is only one of a considerable number of overt acts alleged and where the policy favoring referral is clearly outweighed by other factors such as the probability of undue delay and the overriding importance of early consideration of the other overt acts alleged* * * *." (Emphasis supplied.)

Before considering the precise way in which Isbrandtsen modified ACTA with

respect to this case, it may be noted that this Court, at the request of defendants, had considered Isbrandtsen before it denied the original motion to suspend.

The sequence of events leading up to this Supreme Court decision is of importance in determining its scope. In 1952, an association or "conference" of steamship lines engaged in foreign trade adopted a dual system of international freight rates. Under this system, a shipper would pay less than regular rates for the same service if he signed an agreement to patronize the conference exclusively. The ostensible purpose of the dual-rate arrangement was to meet the competition of an independent carrier, Isbrandtsen Co., Inc. The proposed system was submitted to the Federal Maritime Board for approval pursuant to law, and orders of approval were issued in December, 1955 and January, 1956. Isbrandtsen Company, Inc. petitioned our Court of Appeals to review these orders. That Court set aside the Board's order on the ground that the system of dual rates was illegal *per se* under § 14 of the Shipping Act of 1916, 46 U.S.C.A. § 812 [1956, 99 U.S.App. D.C. 312, 239 F.2d 933].

The Supreme Court [353 U.S. 908, 77 S.Ct. 664, 1 L.Ed.2d 662] granted certiorari to resolve the issue as to the legality of the dual-rate system and stated in its opinion, 356 U.S. at page 487, 78 S. Ct. at page 856:

"* * * The question for our decision is whether the Court of Appeals correctly set aside the Board's orders."

The Supreme Court agreed with the Court of Appeals and held that the dual-rate system was illegal.

 Examination of the opinion shows that the case was not decided by application of the doctrine of "primary administrative jurisdiction". Under this doctrine, the courts often decline to determine a controversy, first presented to it, where it involves a question which is within the jurisdiction of an administrative agency, prior to the decision of that question by the adminis-

trative tribunal, and where the question demands the exercise of administrative interpretation requiring the special knowledge, experience and services of the agency to decide technical and intricate matters of fact.

The court in Isbrandtsen discussed this practical policy of judicial administration in the course of explaining the rulings in two of its earlier decisions which had been relied upon by Far East Conference. On page 496 of its opinion in 356 U.S., on page 860 of 78 S.Ct. it said:

> "Petitioners argue that our construction of § 14 Third is foreclosed by this Court's decisions in United States Navigation Co. v. Cunard S.S. Co., 284 U.S. 474, 52 S.Ct. 247, 248, 76 L.Ed. 408; and Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. A reading of those opinions immediately refutes any suggestions either that this issue was expressly decided in those cases or that our holding here is not fully consistent with the disposition of those cases."

The Court then summarized petitioners' contentions as follows:

> "The Board and the Conference argue that, if the Court in these earlier cases had thought that § 14 Third in any way makes dual rates *per se* illegal and thus not within the power of the Board to authorize, it would not have found it necessary to require that the Board first pass upon the claims."

In rejecting this reasoning, the Court said in 356 U.S. at page 498, 78 S.Ct. at page 861:

> "It is, therefore, very clear that these cases, while holding that the Board had primary jurisdiction to hear the case in the first instance, did not signify that the statute left the Board free to approve or disapprove the agreements under attack. Rather, those cases recognized that in certain kinds of litigation practical considerations dictate a division of functions between court and agency under which the latter makes

a preliminary, comprehensive investigation of all the facts, analyzes them, and applies to them the statutory scheme as it is construed."

Thus, it is clear that the problem of whether or not a district court should refer certain issues to an administrative agency was not squarely before the court in the Isbrandtsen case.

The question next arises: In what precise way does Isbrandtsen modify AC TA? ACTA contained two basic holdings. The first related to the proper forum for decision of issues as to the procedural agreements and their connection with Section 22 rate practices. The second dealt with the exceptional circumstances under which Sec. 5a immunity would not apply. On the first issue, the Court of Appeals held in the ACTA case that the I.C.C. and the District Court had concurrent jurisdiction to decide the intent and effect of approved procedural agreements in relation to Section 22 rates, and whether coverage by these agreements would immunize these rates from the antitrust laws. On page 364 of that opinion in 102 U.S.App.D.C., on page 886 of 253 F.2d the court stated as follows:

> "*In short, the court, while retaining jurisdiction, should in its discretion withhold decision on the interpretation of the statute and existing agreements approved under section 5a, insofar as the challenged practices are concerned, until the Commission has had an opportunity to decide initially whether in its view the Railroads can, with respect to those practices, be relieved of the operations of the antitrust laws under the statute and, if so, whether they have been so relieved by any approved agreement, and, if so, by which agreement or agreements, by what provisions thereof, and as of what date. The Commission might disclaim jurisdiction, or for some other reason might refrain from deciding these questions. We do not hold that it is required to decide them. The court could then proceed according to its own light to inter-*

*pret either the statute or the agreements."* (Emphasis supplied.)

On the second question, it was held in ACTA that, under no circumstances could antitrust immunity under 49 U.S. C.A. § 5b(9) be held to apply to the use of approved procedures to set Section 22 rates if they were part of an effort by railroads in combination or conspiracy to eliminate the competition of Aircoach.

It is clear from the language in its order that the Court of Appeals interpreted Isbrandtsen as modifying the first holding in ACTA only by limiting the District Court's discretion to refer issues.

 It is the governing rule now that the issue of the intent and effect of a rate reduction, claimed to have been taken pursuant to procedures set forth *in agreements approved by the Commission* under Section 5a of the Interstate Commerce Act, must, *in a case where such issue is the sole or dominant issue,* first be referred to the Commission prior to a Court determination of whether such rate reduction violates the antitrust laws.

Thus, it would appear that the second holding of ACTA stands unaffected by Isbrandtsen.

If plaintiff, during the trial, cannot prove an affirmative answer to this question, then it concedes it cannot recover based on the rate reduction issue. On the other hand, if it should develop at the trial that the plaintiff can prove that the rate reduction as set forth in paragraph 18 was one of several overt acts alleged, and prove that this rate reduction was made for the purpose of effectuating one of the principal objects of the conspiracy charged therein; that is, the elimination of the plaintiff as a competitor with the railroads for explosives traffic, then under ACTA no amount of coverage by approved agreements and no degree of immunity under 49 U.S.C.A. § 5b(9) could remove the rate reduction from the prohibitions of the Sherman Act.

 In reaching either of these alternatives, no determination by the Commission seems necessary on the above contentions made by the plaintiff. Even if the Commission were to decide that the rate reduction, considered by itself, conformed to the standards of the Interstate Commerce Act, it is nevertheless well settled that a lawful act may be validly alleged as forming a part of a conspiracy for an unlawful purpose such as to restrain trade. Noerr Motor Freight, Inc., v. Eastern Railroad Pres. Conf., D.C. E.D.Pa.1957, 155 F.Supp. 768.

The basic reason behind defendants' motion to suspend is the expectation of obtaining an I.C.C. ruling that the Section 22 rate reduction is "immunized" from the operation of the antitrust laws by 49 U.S.C.A. § 5b(9). This Court cannot say how the Commission would be likely to rule if this issue alone were submitted to it. After a substantial delay in the final disposition of this issue, it is possible that defendants might obtain an adverse ruling. Then all the harmful effects that a long delay brings to protracted litigation would have been endured to no purpose.

The result would not be different if the defendants won all of their arguments before the Commission. In effect, the Commission would be ruling that the Section 22 rate reduction on explosives, standing alone, were covered by approved agreements on rate procedures and that therefore they are removed from the operation of the antitrust laws by 49 U.S. C.A. § 5b(9). Thus, no antitrust suit could be brought based on the act of reducing rates alone. This would simply mean that a private party could not validly file a complaint alleging that defendants violated the antitrust laws solely because they concertedly lowered the rates on explosives traffic for the United States Government. Without such an immunity provision, railroads would often be suspected of combining to fix prices when they make even routine changes in their rates in cooperation with each other. The railroads are right in their contention that cooperative or joint rate-making is often essential, especially when the goods in question are

normally handled by many companies on a vast, interlocking rail system. As the court in ACTA observed at 1958, 102 U.S.App.D.C. 355, 361, 253 F.2d 877, 883:

> " * * * Furthermore, upon the basis of extensive testimony in committee hearings on section 5a bearing on its possible application to section 22 'rate adjustment' or reduced rates for war materials, the House and Senate Committee Reports pointed out that the evidence was convincing that the joint organizations maintained by the carriers were not only necessary to enable them to meet the commercial requirements of the nation but also were indispensable to the requirements of national defense."

Thus, it would seem that the antitrust immunity that defendants invoke was designed to protect ordinary rate-making in the course of regular business so as to adjust to changing costs and to meet the challenges of outside competition. Could the protection of 49 U.S.C.A. § 5b (9), assumed above, extend to the use of the power to set rates in concert as part of a plan or conspiracy to eliminate competition? According to the holding in ACTA quoted above it could not. Even if a given joint act of reducing rates were to be considered as lawful standing by itself, it may still be properly alleged as one of the means used to effectuate a conspiracy to accomplish an unlawful object. This is clear from the cases cited in the ACTA opinion.

Thus, the rate issue is an integral part of the alleged conspiracy, and cannot be evaluated apart from the other allegations in the complaint. There are two possibilities that would result from referral to the I.C.C. If the I.C.C. heard argument or conducted a hearing solely upon the immunization issue raised by defendants, then its ultimate ruling would, under the plaintiff's allegations, certainly be indecisive. On the other hand, the parties might be permitted to present all of the issues raised by the pleadings so that the Commission could get the entire picture. This would be a laborious way to resolve only one issue in this complex case. Several months would probably be required to present all of this evidence. Furthermore, at the end of this process plaintiff, if it prevailed, would still be unable to obtain the substantive relief it seeks here. An entire retrial of the case would then be necessary in the District Court.

The Court must conclude, therefore, that a reference of the rate-reduction issue to the I.C.C. would be a waste of time and effort and would entail unnecessary expense on the part of all parties to this litigation.

Furthermore, it is also clear that the intent and effect of the Section 22 rate-reduction is in no sense the dominant, much less the sole, issue of this litigation. The complaint as supplemented alleges a complex conspiracy in violation of the Sherman Act. A concerted reduction in explosives rates is alleged to have been one of the many overt acts designed to effectuate the unlawful plan. When the plaintiff filed the original complaint the rate issue was not included and the other allegations were relied upon to constitute a cause of action.

Defendants, in their supplemental memorandum filed September 29, 1958, try to de-emphasize the non-rate allegations of the complaint. On page 8 it is said:

> " * * * There may be some evidence relating to the alleged campaign of defamation. But this will be only to lend color to plaintiff's claim that there is a continuing conspiracy among the defendants.
>
> * * * * * *
>
> "Obviously, plaintiff can say that the complaint raises issues as to defamation. But the assertion of issues does not make them substantial."

However, in the course of oral argument on this motion on May 23, 1958, this Court asked Mr. Ball, counsel for some of the defendants, whether he would be willing to stipulate that the non-rate or other charges contained in plaintiff's complaint are true if the rate-reduction issue by itself were sent to the I.C.C.

(Tr. pp. 95, 96, 97). The exact colloquy is as follows on page 95 of the transcript of proceedings before the Court on May 23, 1958:

"The Court: Let me ask you this. I don't suppose you would consent to this. I wouldn't either if I were you. Would you be willing to go over to the Commission and say to the Commission, in effect, this: that we admit for the purpose of this case, if it is sent over there, that we are guilty of every single thing that the plaintiff says we are guilty of in this complaint; but regardless of that, the Act which you have been speaking about, which enacted 5a, I think, of the Interstate Commerce Commission Act, immunizes us from the antitrust laws, so it makes not a particle of difference whether or not we were guilty of any conspiracy?

"Mr. Ball: I cannot say that because the complaint—

"The Court: Would you do that?

"Mr. Ball: I would not, because the complaint alleges things that go beyond the rate-making actions themselves.

"The Court: I understand. I didn't expect you to do it, frankly. I mean that I am saying that it seems to me that a hearing would have to be conducted over there, pursuant to the ACTA case, to determine whether or not the defendants were guilty of the very things that the plaintiff says they were guilty of. I don't know whether they are or not, and I am not going to know until the evidence is in this case.

"Mr. Ball: Now, let me clarify one point. The Commission is not going to decide whether we went before or did the public relations job.

"The Court: Of course, they are not going to decide that.

"Mr. Ball: Those are the allegations that are not rate-making allegations.

"The Court: I understand that.

"Mr. Ball: But the Commission is the one that has got to decide.

"The Court: They are going to decide whether or not this agreement, the way it was prepared and agreed to, they are going to decide whether or not that agreement itself was a valid agreement, correct?

"Mr. Ball: And first and second whether the activities under it were in accordance with it and, third, whether the rate made under it, was it made in accordance with it, or whether there was a predatory practice or some violation of transportation policy.

"The Court: I understand, and they will limit their investigation and hearing on that point.

"Mr. Ball: Now, with that—

"The Court: These points."

Counsel declined to so stipulate and thus impliedly recognized the importance of those allegations if they could be established as true.

On the factual importance of these non-rate allegations, little can be said at this stage of the case. The parties are in the midst of discovery and the overall picture is far from complete. It is impossible now to tell what evidence the plaintiff will present at the trial. Isolated statements of plaintiff's officers in answer to interrogatories and by way of depositions cannot be the basis for judging the weight or importance of evidence as it may develop at trial, months from now.

Furthermore, these allegations of defamation as well as other charges are not unique to this case. In Noerr Motor Freight, cited above, several of the allegations appear to resemble some of those in this litigation. It, too, was a private antitrust suit for treble damages and injunctive relief brought by trucking firms against railroads, rail associations and a public relations firm. At the outset, Judge Clary, the trial judge, felt that the charges seemed somewhat incredible. Cf. 155 F.Supp. 808. After presiding

over a four month trial, the judge made the following finding, on page 816:

"The proofs in this case have definitely established joint action on the part of all of the defendants to destroy the good will and injure the business of the plaintiffs. They have proved the formation of so-called 'independent citizen groups' which were mere pawns in circulating information derogatory to the plaintiffs; dissemination of false information to customers of the plaintiffs for the same purpose; the organization of groups to protest the use of the highways by plaintiffs' 'Big Trucks', and the duping and using of public officials and officials of independent organizations to accomplish the same purpose of driving the plaintiffs out of competition with the defendants. The actions of the defendants do not fall within legal bounds of either proper means or proper objectives and consequently such activities must be condemned."

After a separate hearing on the issue of relief and damages, the Court enjoined defendants from continuing the conspiracy charged and awarded $652,000 damages plus $200,000 counsel fees. Cf. D.C., 166 F.Supp. 163. The judgment is now on appeal.

■ Defendants also contend that plaintiff's request for injunctive relief to prevent further acts unrelated to the rate cut is not to be taken seriously, because plaintiff has made no effort to seek a preliminary injunction. This failure, it is argued, shows that plaintiff does not really think it can show substantial injury resulting from the alleged defamation campaign. But more reasonable inferences may also be made. The size and scope of the conspiracy alleged would make necessary a lengthy and costly hearing. Preparation for this would involve the same kind of detailed discovery that is now going on in preparation for the trial itself. The procedure of waiting until the case has been presented on its merits was followed in the Noerr case and, furthermore, a separate hearing on the question of relief and damages was there held some time after the trial. Thus, no inference adverse to plaintiff can be made based on its failure to seek an injunction before the trial on the merits.

From the above discussion, it is clear that the purely legal standards for referral of the rate reduction issue to the Commission have not been met. It is not the sole or dominant issue of the case and no possible ruling as to its coverage by prior approved procedural agreements would be conclusive where such rate reduction is alleged to be part of a conspiracy to restrain trade. At this point, certain practical aspects of the referral problem must be considered.

In the first place, undue delay with accompanying hardship and expense to the parties would almost certainly result if this issue were referred to the Commission. The rate question, while not the sole or dominant issue of the case, is, nevertheless, an essential segment of plaintiff's cause of action and equally as important as the other allegations. The trial on the merits could not proceed properly with this aspect of the case missing. Referral would delay the entire litigation. This Court has no power to compel the Commission to make any ruling at all, much less to bring about a prompt decision. A determination would have to await its turn on the Commission's crowded docket. It might be that many months would pass without Commission action. The Court would then probably have to wait a reasonable time before itself taking action, and this might amount to one or more years. What "a reasonable time" might be can perhaps be gauged by examining the duration of past Commission proceedings involving numerous parties. In the memorandum filed by plaintiff, it cites the so-called Government reparations suits as an example. These actions involved many of defendants here and dealt with the reasonableness of the railroad explosives rates which had been in effect prior to the rate reduction in November, 1955. The suits were initially

filed by the Government in September and October, 1947. It was not until February, 1955, almost eight years later, that the Commission ruled that the pre-1955 explosives rates were reasonable. Cf. 294 I.C.C. 5. Approval by the Commission of some of the Section 5a procedural agreements mentioned above consumed a great amount of time. This ranged from eleven months for the Western Traffic Association's agreement to two years nine months for the agreement submitted by the Southern Freight Association.[1]

The experience of the plaintiff in AC TA may also be relevant here. On pages two and three of the Memorandum of Aircoach Transport Association, Inc., et al., as amicus curiae, filed in our Court of Appeals in this cause (No. 14,562), it is stated that on April 18, 1958 the District Court in ACTA entered an order in which proceedings were to be instituted before the I.C.C. by one or more of the parties within 20 days of this date; that proceedings before the I.C.C. were commenced before it on April 22, 1958, by the filing of a petition or complaint initiating proceedings; and that the Commission has not yet acted on the issues referred to it under the District Court's order of reference.

Thus, it will be seen that it has been over eight months since proceedings were started before the Commission and as of October 31, 1958 it had not yet taken any action. Besides that, there is nothing to indicate to this court how long it will take for the Commission to render its decision in that case, and even after the Commission has rendered its decision, its ruling may be appealed by one of the parties. If this happens, considerably more time will undoubtedly elapse before the Courts will be able to render a final decision in that case.

It must also be remembered that in connection with defendants' motion to suspend proceedings, it also requests that all discovery proceedings regarding the rate reduction issue be suspended until the Commission has made its ruling.

It would thus seem that a reasonable time before Commission action might well be measured in years rather than months. The Court has taken into consideration the fact that this action has been pending more than four years; that it will be many months before a trial can be had, and that it will take from four to six months to try the case. It would be contrary to sound judicial discretion to permit this additional delay to this over-postponed litigation merely to seek an optional ruling from the Commission on the rate reduction aspect, which is not the sole or dominant issue in this case.

In addition, the very nature of the other overt acts alleged reveal the great importance of early consideration of these acts on their merits as soon as practicable. The claims and counterclaims in this case indicate continuing injury to the business of the various parties. Plaintiff's request for injunctive relief should be resolved without unnecessary delay. New delay will add to the difficulty of obtaining witnesses and will further dim memories of facts essential to all parties. The extraordinary cost to all parties of this litigation would also be increased.

Thus, the Court concludes that too much delay has already taken place in the disposition of this case. In fairness to all parties, the Court deems it essential to get to the merits of the case as

1. WTA — Agreement application filed November 15, 1948; decided October 3, 1949, 276 I.C.C. 183; Eastern Railroads [TEA] — Agreements application filed December 7, 1948; decided March 15, 1950, 277 I.C.C. 279; Southern Freight Association, et al. — Agreements, application filed January 5, 1949; decided October 18, 1951, 283 I.C.C. 245.

See also, Illinois Freight Association — Agreement, application filed April 28, 1950; decided August 17, 1951, 283 I.C.C. 17; Southern Ports Foreign Freight Committee — Agreement, application filed March 16, 1950; decided April 11, 1952, 284 I.C.C. 775; Railroad Interritorial Agreement, application filed October 18, 1950; decided January 21, 1953, 287 I.C.C. 701.

speedily as possible. Reference to the Commission would only serve to thwart this purpose.

## II.

In addition to the joint memorandum filed on behalf of most of the railroad defendants, Atlantic Coast Line and seven other Southern railroads filed a supplemental memorandum on September 29, 1958 raising questions allegedly relating to them alone. Two defendants who did not take part in the joint memorandum; namely, the Central Vermont Railway and the Grand Trunk Western Railroad Company, asked permission to file a memorandum containing their contentions with respect to the motion to suspend, and their request was granted. The questions raised by both memoranda will be considered together at this time.

The underlying contention here is that the rate reduction is clearly the dominant issue as to them and hence they, at least, should be permitted to litigate the question of antitrust immunity under 49 U.S.C.A. § 5b(9) before the I.C.C. The southern railroads, on page 3 of their brief, point to statements by plaintiff's counsel in connection with an earlier motion that they were neither prime movers nor principal beneficiaries of the alleged defamation conspiracy. They also cite the depositions of plaintiff's principal officers to the effect that no official was able to state of his own knowledge what specific role was played by the southern railroads in the alleged defamation campaign outside of the publication of a certain anti-truck article in one of their magazines. At page 6 of their memorandum, the southern railroad defendants concede that they also made a contribution toward the production of a film by the Farm Roads Foundation. The publication of the magazine article is set forth in the complaint as one of the overt acts done to effectuate the conspiracy and the film production has been mentioned by plaintiff in affidavits as one of the concerted methods used by defendants in connection with the alleged conspiracy. The southern railroads admittedly took some part in the I.C.C. hearings in opposition to the application by Riss and other motor carriers for operating authority. As to the rate reduction, it is said at page 8 of their brief:

"While rates in southern territory were reduced several months later, in March and April of 1956, the reductions could hardly have been intended to and did not affect the competition of Riss since Riss does not operate to any significant extent in southern territory. Thus, the supplement to the complaint does not include this later reduction in its allegations."

Thus, it is clear that southern railroads are merely urging statements of fact and inferences contrary to those made by the plaintiff in its complaint and sworn affidavits. The court is asked to divide this litigation and to refer the rate reduction issue regarding a few defendants to the I.C.C. based on conflicting assertions as to how much or how little these few defendants may be involved in the issues raised by the complaint.

Despite the conflict, there seems to be a sufficient basis in the statements of defendants alone to connect them in some degree with the activities of the other defendants. Even if the evidence should show these defendants took only a small part in the alleged conspiracy, if they did so with knowledge of the conspiracy and consented to take part in it, then they assume equal responsibility for the acts of all conspirators. As was said in United States v. National City Lines, 7 Cir., 1951, 186 F.2d 562, 571:

"* * * Nor does the circumstance that certain of the supplier defendants had requirements contracts with one but not both of the City Lines defendants absolve those defendants of participation in the conspiracy charged in the indictment or prove that no such conspiracy existed; it was not incumbent on the government to prove that each defendant participated in that conspiracy in all of its ramifications, for, in order that one be found guilty as a conspirator, it need only be

shown that, with knowledge of the existence of the conspiracy, he knowingly performed an act designed to promote or aid in the attainment of the object of that known conspiracy."

When one enters after the inception of a continuing conspiracy, he becomes liable for the acts of all the conspirators since the conspiracy is, in effect, renewed each day of its existence. United States v. Borden Co., 1939, 308 U.S. 188, 202, 60 S.Ct. 182, 84 L.Ed. 181; United States v. New York Great Atlantic and Pacific Tea Co., 5 Cir., 1943, 137 F.2d 459, 463, certiorari denied 1943, 320 U.S. 783, 64 S.Ct. 191, 88 L.Ed. 471. A reading of the complaint reveals that plaintiff will attempt to prove the existence of an antitrust conspiracy continuing over a period of several years. When dealing with such a charge, it is essential to consider the allegations as a whole and not to dismember it into many parts. United States v. Patten, 1913, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333.

Since, therefore, the defendants' degree of participation cannot be judged before plaintiff has presented all its evidence and since even a lesser role in a conspiracy may bring about liability equal to that of prime movers, it cannot be said that any one allegation such as the rate reduction issue is of dominant importance as to these defendants.

These considerations apply with equal force to defendants Grand Trunk Western Railroad Company and Central Vermont Railway. They urge on page 3 of their separate memorandum that the only connection with the defamation allegations which has been so far adduced is the mere "mute membership" of each petitioner in two of the rail associations named as defendants, and that, hence, the rate reduction is the dominant issue as to them. They cite United States v. Food and Grocery Bureau of Southern California, D.C.S.D.Cal.1942, 43 F.Supp. 966, 973, to establish the principle that mere mute membership in an association charged with an unlawful criminal conspiracy will not impose liability upon a

member. This would seem to be in accordance with the general principles of conspiracy law discussed above. Some degree of knowledge and consent to the conspiracy or some kind of knowing assistance given in furtherance of it is usually required to impose liability.

In their brief, these defendants simply deny any other connection with the alleged defamation conspiracy except "mute membership" in railroad associations which are defendants in the case and base this denial on certain answers to interrogatories. On page 3 of their memorandum it is said:

"* * * Indeed, after almost four years of pleading and discovery procedures the only nexus relating the undersigned defendants to the alleged conspiracy is their membership in several railroad associations to whom Riss has imputed leadership in this supposed campaign of defamation. These two railroads were members of the Association of American Railroads and the Eastern Railroad Presidents Conference, and the Grand Trunk Western Railroad Company belonged to the Traffic Executive Association—Eastern Railroads (Central Vermont Railway, Inc., did not). However, no officer or employee of either railroad served as an officer in any of the associations."

The Court is asked to accept the above statement at this stage of the case for the purpose of granting their motion to suspend proceedings as to them and refer the rate reduction issue to the Commission apart from the disposition of the motion with respect to the other defendants. However, this was not the question before Judge Yankwich in the Food and Grocery case which was particularly relied upon by defendants in this motion. That case does not stand for the proposition that allegations of membership in an association charged with a conspiracy, without more, warrants a dismissal of that party from the case before the Court has had an opportunity to hear the evidence. The statements relied

upon by defendants were made by Judge Yankwich in connection with motions by various defendants to dismiss at the close of the government's case. The charges were dismissed as to some defendants after the government had presented its entire case because the Court was satisfied that the evidence had failed to establish consent to or participation in the alleged conspiracy. The Court approves of this procedure. If it appears at the end of plaintiff's case that the evidence does not adequately connect any defendant with the charges contained in the complaint, then a motion for a directed verdict as to such defendant may be entertained.

■ However, just as the Court could not logically dismiss defendants from the case at this point because it is not yet aware of what the evidence may show at trial, in like manner, it would not be proper to assume that these two defendants had little or no connection at all with the alleged defamation conspiracy in order to reach the conclusion that the rate reduction issue is the sole or dominant issue as to them. Besides, it is a well-settled principle of conspiracy law that a defendant may be held fully liable for the consequences of a conspiracy even though its degree of participation may turn out to have been somewhat less than that of other defendants.

The very sound judicial policy against dealing with litigation piecemeal also militates against defendants' position. Since the court could not proceed with the trial until the Interstate Commerce Commission had an opportunity to take action, unnecessary delay would result in this long-delayed case if the defendants' motion to suspend were granted.

### Conclusion

The order of this Court dated May 26, 1958, denying the motion by certain railroad defendants to suspend proceedings in this case and to refer certain issues to the Interstate Commerce Commission for determination is hereby vacated.

For the reasons set forth in the above opinion, and in conformity with the orders of the United States Court of Appeals for the District of Columbia Circuit dated August 8, 1958 and December 16, 1958, the Court makes the following rulings:

1. The motion of defendant railroads to suspend proceedings and to refer certain issues to the Interstate Commerce Commission as supported by the memorandum on behalf of all movants filed September 29, 1958 as well as by the supplemental memorandum on behalf of Atlantic Coast Line Railroad Company, et al., filed September 29, 1958, is hereby denied.

2. The motion of defendants Central Vermont Railway, Inc., and Grand Trunk Western Railroad Company to have proceedings suspended as to them is hereby denied.

Counsel for plaintiff will submit an appropriate order in accordance with this opinion.